**NATIONAL GATEWAY TELECOM, INC., Plaintiff,**

v.

**Edward C. ALDRIDGE, Jr., Secretary of the United States Air Force, Defendant,**

**and**

**International Business Machines Corporation, Defendant–Intervenor.**

**Civ. A. No. 88–4098.**

United States District Court, D. New Jersey.

Dec. 19, 1988.

Crummy, Del Deo, Dolan, Griffinger & Vecchione by Ann G. McCormick, Newark, N.J., and Geltner and Associates by Michael E. Geltner, Washington, D.C., for plaintiff.

Samuel A. Alito, Jr., U.S. Atty. by Jerome L. Merin, Asst. U.S. Atty., Deputy Chief, Civ. Div. (Scott Bagley, Major, Judge Advocate Gen., U.S. Air Force, of counsel), Newark, N.J., for defendant Edward C. Aldridge, Jr., Secretary of the U.S. Air Force.

Riker, Danzig, Scherer, Hyland & Perretti by Thomas E. Moseley, Morristown, N.J., for defendant-intervenor Intern. Business Machines Corp.

## OPINION

DEBEVOISE, District Judge.

Plaintiff, National Gateway Telcom, Inc., instituted this action against Edward C. Aldridge, Junior, Secretary of the United

States Air Force, seeking to enjoin the Air Force from procuring computer equipment covered by a Request for Proposal issued on or about June 1, 1988. International Business Machines Corporation intervened as a defendant. After the filing of the complaint and the issuance of an order to show cause a period of intensive discovery ensued. A hearing on the application for a preliminary injunction was held on December 2, 1988. The evidence consisted of the materials derived during discovery, affidavits and exhibits.

Count One of the complaint charges that the Air Force violated the Competition in Contracting Act, 10 U.S.C. Section 2304(a), by failing to obtain full and open competition through the use of competitive procedures in accordance with the requirements of applicable laws and regulations, and by failing to use the competitive procedures best suited under the circumstances of the procurement.

Count Two charges that the Air Force violated restrictions against unjustified sole source contracts by awarding to a sole source under another contract without making the written findings set forth in 10 U.S.C. Section 2304(f)(1).

Originally Count Three charged a violation of 48 C.F.R. Section 17.207 governing the exercise of options under a contract. In subsequently filed papers plaintiff notes that since the record failed to establish an option contract, Count Three should be dismissed. Plaintiff seeks to amend the complaint to add a new Count Three charging that the contract pursuant to which the computer equipment was ultimately purchased was entered into without full and open competition required by 10 U.S.C. Section 2304(c) and without a finding that one of the statutory exceptions was applicable.

A. *The Facts:*

The Electronics Security Command of the United States Air Force (ESC) belongs to the Department of Defense Intelligence Information Systems Community, a grouping of defense agencies sharing expertise and supplies. At the times pertinent to these proceedings Linda Smith was an ESC contracting officer responsible for procurement of automated data processing equipment. She worked at Kelly Air Force Base under the direction of of Juanita Condra.

The subject of this action is automatic data processing equipment for use in an electronic warfare and cryptological program called the Constant Web. Lieutenant Colonel John Lilly was the program manager for the equipment being purchased.

ESC's original purchase requirement formulated in May or June 1987, was for IBM 4381 series equipment obtainable through the DIA/Virginia Contracting Activity which is also a member of the Department of Defense Intelligence Information Community. The need changed to a configuration built around the IBM 3090.

In November 1987, ESC was informed by the Virginia Contracting Activity that an acquisition of that nature would require a sole source justification. ESC concluded that the acquisition could be competitive and decided to do its own acquisition. Planning for the issuance of an RFP began in February or March 1988.

On June 1, 1988, ESC publicly noticed a request for proposals RFP F41621–88—R–0033 (the RFP) seeking to acquire the equipment. Under the RFP offerors were to put together a configuration or assemblages of various equipment which was centered around either IBM equipment or other equivalent equipment.

In response to the June 1 notice, ESC received numerous inquiries. IBM, Pacificorp Capital, which was an affiliate of National Gateway, Federal Data, Amdahl Corporation and Storage Tech participated in the proposal process. Questions from contractors were analyzed and answered, and all answers were distributed to each contractor along with four amendments to the solicitation. A number of bids were received on the RFP on July 18, 1988. IBM did not bid.

Personnel of PacifiCorp Capital, the affiliate of National Gateway, had handled the bid originally, but since PacifiCorp lacked proper security clearance, the bid was assumed by National Gateway.

The bids responding to the RFP were evaluated in late July. A low offeror was determined, but no award was made. National Gateway was not the low offeror.

Federal Systems, a Washington, D.C. area corporation, complained to the Air Force procurement personnel that it had not been notified of the closing date for its submission of proposals, and that, therefore, the solicitation was defective. Ms. Smith on behalf of ESC rejected the complaint and declined to reopen the bidding process.

Shortly afterwards Ms. Smith learned that Federal Systems had advised the Air Force that it believed that the RFP was also defective because it did not comply with the provisions of the Nunn–Warner Amendment, 10 U.S.C. Section 2315. A brief explanation of the situation which faced Ms. Smith is required.

The Competition in Contracting Act, 10 U.S.C. Sections 2301, et seq. enunciates a policy that the Department of Defense obtain contracts in a timely, economic and efficient manner. Procurements, when practicable, should be obtained at times and in quantities that will result in reduced costs to provide incentives to contractors to improve productivity. The Department of the Air Force is covered by the Competition in Contracting Act.

The Act also requires that, in the ordinary case, contracts for property be made by formal advertising and mandates that awards be made on a competitive bid basis to the lowest bidder. Government purchases of automated data processing computer equipment receives specialized treatment in that it must be acquired through procedures established and supervised by the General Services Administration. 40 U.S. C. Section 759 (the "Brooks Act").

Under the Nunn–Warner Amendment, however, the Defense Department is exempt from the Brooks Act when it purchases automated data equipment for, inter alia, intelligence and cryptologic activities. The ESC processed the RFP under the Nunn–Warner Amendment exception.

When Ms. Smith completed the ESC solicitation pursuant to the exception to the Brooks Act, she did not provide a Mission Critical Computer Resource document pursuant to Air Force Regulation 700–4, Volume II, paragraph 3–4c(2). It was the failure to provide this document which was the basis of Federal System's contention that ESC had failed to comply with the provisions of the Nunn–Warner Amendment.

On or about August 11 Ms. Smith received a telephone call from Frank Burke of the Pentagon inquiring about whether the procurement was covered by the Nunn–Warner Amendment. His called had been prompted by Federal System's complaints. Ms. Smith discussed the situation with Mr. Burke and with a Major Mather, both of whom were experienced persons in the fields of automated data processing requirements and acquisitions. Both of them were of the opinion that the absence of the Mission Critical Computer Resource document could subject the solicitation to a successful protest. Ms. Smith consulted with three other Kelly Air Force Base senior persons specializing in automated data processing requirements. She attempted unsuccessfully to secure a timely opinion from the Base legal staff.

Based on these discussions on August 12, 1988, she canceled the solicitation rather than proceeding with a solicitation which ran the risk of being successfully challenged.

Ms. Smith decided that the RFP should be resynopsized for the Commerce Business Daily. Under the Competition in Contracting Act, RFPs must be synopsized in the Commerce Business Daily, unless they are exempted from the publication requirement. This is a mechanism for potential bidders to find out about an available RFP and to contact the soliciting agency for a copy.

The RFP was resynopsized in the Commerce Business Daily on August 12, 1988. Ms. Smith called the bidders on the aborted RFP and informed them of its withdrawal and impending reissuance. She gave them a choice of leaving their bids or taking them back. National Gateway was among those called, and was later informed in

writing that the RFP would be reissued September 6, 1988.

In mid-August after the RFP had been resynopsized and after the bidders had been given the information described above, William Breedlove, a San Antonio IBM salesman, having learned of the cancellation of the RFP, called Lieutenant Colonel John Lilly, the program manager of Kelly Air Force Base and told him that IBM had recently signed a requirements contract with the Virginia Contracting Activity for the same equipment. Colonel Lilly on the same day advised Ms. Smith of this telephone call and conveyed to her the information which Breedlove had given him.

At this point it is necessary to digress and to trace the history of the requirements contract which Breedlove brought to the attention of Colonel Lilly, and through him to Ms. Smith.

On October 16, 1987, the Virginia Contracting Activity/DIA issued a solicitation for IMB 3090 or equivalent equipment. A contracting officer of the Virginia Contracting Activity had determined that public advertising of the requirement was inappropriate and that limited competition was authorized under the Competition in Contracting Act.

Accordingly, the solicitation was not synopsized in the Commerce Business Daily and it was sent to major manufacturers of the equipment and opened to all offerors as a competitive requirements contract. The solicitation was sent to Amdahl Corporation, IBM, National Advance Systems, Inc., CMI Corporation and UNISYS Corporation. Storage Technology Corporation and Federal Data Corporation also considered submitting proposals on the solicitation.

National Gateway's affiliate PacifiCorp Capital sought out Amdahl Corporation in an attempt to pair with Amdahl on the solicitation. Amdahl rejected the PacifiCorp overture and paired with another company. PacifiCorp did not submit a proposal.

On July 27, 1988, Virginia Contracting Authority awarded the contract to IBM and the award was assigned on August 11, 1988. The contract will be referred to herein as the "DIA contract." It will be recalled that on the very same day but totally independently of the Virginia Contracting Authority solicitation, Ms. Smith received a telephone call from Mr. Burke raising the question whether there had been a failure to comply with requirements of the Nunn–Warner Amendment.

It will also be recalled that prior to Breedlove's telephone call to Colonel Lilly advising him of the award and assignment of the Virginia Contracting Authority solicitation to IBM, Ms. Smith had canceled the ESC solicitation, had caused the RFP to be resynopsized in the Commerce Business Daily and had called the bidders on the RFP, informing them of their options in light of the decision to cancel.

During the week of August 22, 1988, Ms. Smith made inquiries of Paul Kittle, the assistant deputy chief of the Virginia Contracting Activity, and the contracting officer administering the IBM requirements contract at the Virginia Contracting Activity, concerning the nature of the IBM contract and whether the equipment being obtained pursuant to that contract would satisfy the Air Force's needs for the equipment sought pursuant to the canceled RFP.

Mr. Kittle suggested that Ms. Smith send her configuration to him so that he could advise whether the Virginia Contracting Activity could satisfy it. Mr. Kittle responded affirmatively that his agency could support the Air Force's needs. On September 2nd, 1988, Ms. Smith sought a final commitment which would set forth the terms of the DIA contract and the dollar amounts of the items to be purchased.

On September 7, formal confirmation was sent to Ms. Smith and ESC. On September 9, Ms. Smith prepared a Determination for Interagency Acquisition under the Economy Act which summarized her decision to acquire the equipment under the DIA contract. She also prepared a Determination setting forth her decision not to renew the canceled RFP. Each Determina-

tion is a detailed statement of reasons for the action taken.

Ms. Smith promptly notified the bidders on the RFP not to resolicit. On September 20, 1988, a purchase order pursuant to the DIA contract was executed in order to allow for the procurement of the equipment in question.

In the present action National Gateway seeks to enjoin preliminarily implementation of the purchase order.

## B. *National Gateway's Contentions:*

National Gateway's position has evolved and discovery has disclosed more of the underlying facts. In its original papers National Gateway contended that ESC violated federal laws mandating open, competitive bidding when it canceled the solicitation upon which National Gateway bid and decided instead to procure the automated data processing equipment by exercising options on a noncompetitive basis on an older, existing contract. More specifically, National Gateway charged that ESC had engaged in maneuvers designed to ensure that IBM received the contract. These maneuvers included, first, withdrawal of the RFP for the pretextual reason that proper procedures had not been followed and, second, the exercise of the option under the existing contract with IBM for an improper reason, namely, that the RFP would not be completed in fiscal year 1988, ending September 30, and ESC needed to spend 1988 funds to avoid jeopardizing its 1989 budget.

When discovery disclosed that ESC had not exercised an option under an existing contract, National Gateway revised its contentions and asserted that ESC's method of acquiring the equipment constituted procurement in less than full and open competition under the Competition in Contracting Act.

More specifically, it still contends that the entire procedure adopted by ESC was a maneuver designed to ensure that IBM receive the contract and that the maneuver included withdrawal of the RFP for a pretextual reason. However, National Gateway now contends that the Virginia Contracting Authority RFP was conducted under unlawful, noncompetitive conditions designed to benefit IBM.

National Gateway claimed that the Virginia Contracting Authority RFP was conducted under "other than full and open competition," based on a finding that, in the interest of national defense, it could not be synopsized in Commerce Business Daily because that would reveal to the world at large what was being purchased for intelligence organizations. As a result of that finding, as noted above, the RFP was mailed to only five potential bidders. National Gateway asserts that with respect to Amdahl Corporation and National Advance Systems, Inc. the RFP was mailed to addresses least likely to gain the attention of persons likely to bid.

National Gateway also asserts that there were a number of things about the Virginia Contracting Authority RFP which limited competition. It provided a $1 million assessment against any bidder which did not manufacture all the items on the list, which would be everybody except IBM. It required an integrated vector processor facility, thus eliminating Amdahl which did not manufacture one. It required IBM proprietary software and provided for evaluation of bids to be based 60 percent on technical factors and 40 percent on price, thus giving an inordinate weight to subjective views of the contracting officers who, it is alleged, had a strong preference for IBM equipment.

A number of concerns made inquiries and/or attempted to obtain provisions in the RFP so that they could bid, but, according to National Gateway, no revisions were made and in the end, IBM was the only bidder.

As we have seen IBM was awarded the contract.

I note parenthetically that at the preliminary injunction hearing it was learned that the $1 million assessment had been eliminated by a late amendment to the solicitation.

Thus, National Gateway urges that ESC improperly terminated the solicitation for the purpose of obtaining from IBM the

equipment in question under a requirements contract which was invalid, having been procured without full and open competition.

At the hearing on the application for preliminary injunction, National Gateway refined these allegations and asserted that it was entitled to the relief it sought on four grounds, two of which, it asserts, raise no factual questions and can be decided forthwith, and two of which it further asserts, require development of the record. The complaint will be deemed amended to include these grounds. They are:

First, ESC, which originally conducted its procurement on a full and open competition basis under the Competition in Contracting Act unlawfully arranged to procure its equipment under another agency's limited competition contract without first having made a determination that 10 U.S.C. Section 2304(c) permits the use of other than competitive procedures.

Second, approximately 40 percent of the procurement was sole sourced, a procedure permitted only in unusual circumstances not present in this case.

Third, the DIA contract was improperly secured although it purported to comply with the Competition in Contracting Act requirements for a limited competition procurement. In fact, compliance was a charade designed to conceal a prior decision to secure IBM equipment.

Fourth, the ESC procurement constituted a sham showing of compliance under the Competition in Contracting Act designed to conceal an effort to procure equipment from one vendor, namely IBM.

### C. *Conclusions of Law:*

The Court has jurisdiction under 28 U.S.C. Section 1331(a) in that the case arises under the laws of the United States. A district court has jurisdiction to award injunctive relief to a disappointed bidder in a government contract case. *Coco Bros., Inc. v. Pierce,* 741 F.2d 675 (3rd Cir.1984).

1. Application for Preliminary Injunction:

Under generally applicable rules, the factors which a court must consider upon an application for preliminary injunction are, (i) the moving party's likelihood of success on the merits, (ii) the extent, if any, of irreparable injury to the moving party if the relief is denied, (iii) the extent of the harm to other parties if the relief is granted and, (iv) the effect upon the public of the grant or denial of the preliminary injunction. I turn first to the likelihood of National Gateway's success on the merits.

Review of government contracting decisions is governed by the Administrative Procedure Act, 5 U.S.C. Sections 701, et seq., *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859, (D.C.Cir.1970). District Court review of an agency's procurement decision is limited in scope. The standard for injunctive relief is: "Government contract decisions should not be overturned unless 'there is no rational basis for the agency's decision' and 'a showing of clear illegality is an appropriate standard to impose on an aggrieved bidder who seeks judicial relief.'" *Coco Bros., Inc. v. Pierce, supra,* at 679.

It is necessary to examine each of National Gateway's claims of illegality from the perspective of this standard of review.

As recited above, National Gateway's first argument is that in the face of a statutory prohibition, ESC moved from full and open competition to limited competition by failing to proceed with a new RFP and electing instead to proceed under the DIA contract. National Gateway's principal reliance is on the language and intent of the Competition in Contracting Act, but preliminarily it advances three circumstances which, it asserts, render unlawful the change in the procurement method.

The first circumstance is ESC's desire to commit itself to spending the money before the end of the fiscal year, (September 30, 1988) so as to avoid budget cuts in the succeeding year.

As an internal management tool, if one unit of the Air Force fails to spend 80 percent of its funds in any fiscal year, the Air Force will give its funds in later years to other units. Contracting Officer Smith's

conversations with National Gateway officers and internal ESC memoranda, establish that a significant consideration in the selection of the DIA route was ESC's perceived need to avoid future funding cuts.

I think it is obvious that avoiding future funding cuts is not a ground for escaping the requirements of the Competition in Contracting Act. However, I think it is equally obvious, that if all the requirements of that Act or of any other applicable statute are complied with, there is no reason why a contracting agency cannot consider the effect of an acquisition on the future availability of funds it requires to carry out its responsibilities.

In the present case on September 9, 1988, ESC's contracting officer made determinations supporting cancellation of the new RFP for equipment and supporting the acquisition under the Economy Act. Each determination included among its findings the circumstance that proceeding under the Economy Act would achieve the obligation rate needed to prevent budget cuts in the next fiscal year. That, however, was but one of a number of findings. If the other findings justify the action taken, and if they are supported by the record, the importance accorded to funding cut considerations would not invalidate the proceedings.

Next National Gateway contends that ESC decided to proceed under the Economy Act without ever knowing what the unit price of the equipment would be, and without knowing until just before the determination was made what the aggregate price would be. The record establishes that during the period from mid-August when ESC learned of the DIA contract and September 8, 1988, ESC's contracting officers were in continuing communication with the Virginia Contracting Activity to ascertain whether use of the DIA contract would be appropriate. Even if it was just before the September 9th determination that ESC was able to fully calculate the aggregate price if it proceeded under the DIA contract, the record supports its conclusion that "prices were equal to or lower than those being evaluated for award under R 0033."

ESC had available to it the figures contained in the lowest bid under the original RFP and concluded that the total cost would be less under the DIA contract. The fact that it did not yet have unit prices does not render reliance on the available maximum aggregate price data unreasonable. In fact, when unit pricing became available it developed that the acquisition could be effected for substantially less than the maximum aggregate price.

The third circumstances upon which National Gateway relies is the cancellation of the original RFP. It will be recalled that ESC had canceled the RFP because it had failed to provide documentation required by Air Force regulations as a prelude to an acquisition under the Nunn–Warner Amendment. ESC feared that the failure to provide the documentation might be the basis for a successful protest.

As recited above, the Nunn–Warner Amendment exempted acquisition of specified data processing equipment from the requirement of the Brooks Act that generally data processing equipment must be acquired through the GSA. National Gateway contends that ESC's fear of a successful protest based on the lack of documentation was baseless and unreasonable and therefore nothing more than a pretext to enable ESC to obtain IBM equipment. In the words of National Gateway's counsel at the preliminary injunction hearing "The reason [the lack of documentation] was not a significant threat is that the [General Services Board of Contract Appeals] had decided precisely the same point twice previous to this date, that any lawyer that had been called in would have taken the time to look and find those two cases and would have told the Kelly Air Force Base personnel that there was not a worry because this was settled law in the [General Services Board of Contract Appeals]." (Hearing transcript page 11.)

The cases to which counsel referred are *Cyberchron Corp.*, 88–2, BCA, paragraph 20,783 (April 26, 1988) [available on WESTLAW, 1988 WL 52314], and a case cited in and relied upon by *Cyberchron,* namely, *Management Systems Designers, Inc.,*

88–1 BCA, paragraph 20,404 (December 17, 1987) [available on WESTLAW, 1987 WL 46032].

I have read the opinions to which National Gateway's counsel refers and conclude that no lawyer could rely upon those opinions as a basis for advice that the failure to provide all required documentation in the original RFP in this case could not be a ground for a successful protest. Those two cases simply held that the failure to provide documentation for contracts within the Nunn–Warner Amendment did not have the effect of subjecting those contracts to GSA's jurisdiction under the Brooks Act. The two cases had nothing whatsoever to say about the validity of contracts subject to the Nunn–Warner Amendment if proper documentation had not been provided. That was an issue which GSA did not have jurisdiction to address.

In the most recent of those two cases *Cyberchron* filed a protest concerning the purchase by the Navy of automatic data processing equipment. *Cyberchron* submitted that modifications in the specifications constituted a cardinal change and that as a result, the Navy was allowing the award winner to proceed under a new sole source contract without full and open competition. The Navy moved to dismiss the protest for lack of jurisdiction.

As in the present case, there was no question that the units to be purchased were for a purpose specified in the Nunn–Warner Act and thus exempt from the provisions of the Brooks Act and from GSA's protest jurisdiction.

*Cyberchron* argued that the failure on the part of the Navy to comply with an applicable regulation called for a determination that the contract was not covered by the Nunn–Warner Amendment and therefore was within GSA's jurisdiction. Rejecting this reasoning the Board of Contract Appeals declined to rule on the merits of the protest and stated:

"We remain convinced that compliance or noncompliance where the DOD requirement for determination that the Warner amendment is applicable to pro-

curement does not dictate the determination which we make regarding our jurisdiction over a protest which may arise involving the procurement."

Applying *Cyberchron* to the present case, it would suggest that the failure to provide required documentation for the original RFP would not remove the acquisition from the provisions of the Nunn–Warner Amendment and confer jurisdiction upon GSA and the Board of Contract Appeals. *Cyberchron* had nothing whatsoever to say about the validity of the RFP absent the determination or about the manner in which the appropriate reviewing authority would decide a protest alleging the lack of documentation as the grounds of invalidity.

Thus it was not at all unreasonable for ESC to ignore the two inapplicable GSA cases and to conclude that continuation of the acquisition pursuant to the original RFP ran the risk of a successful protest.

Having rejected National Gateway's contention that the three circumstances discussed above make unlawful ESC's use of the DIA contract, we can turn to the principal component of its first claim of invalidity, namely, that the Competition in Contracting Act prohibits ESC from substituting the DIA contract, which was entered into under conditions of limited competition, for the full and open competition contemplated by the original RFP.

National Gateway relies on 10 U.S.C. Section 2304(c) which provides that "[t]he head of an agency may use procedures other than competitive procedures only when . . .", and then there are listed seven situations in which less than fully competitive procedures may be employed. 10 U.S. C. Section 2304(f)(1) requires justification of the contracting officer and approval of the justification by other or higher authorities before a contract is awarded using other than fully competitive procedures. Relying on these provisions of the statute, National Gateway's counsel argued at the preliminary injunction hearing:

"The statute, Section 2304 of Title 10 requires full and open competition. What that means is that the procurement

is advertised in Commerce Business Daily, and that anybody who is a potential bidder has the knowledge of the basic procurement and can get copies of the RFP. In order to avoid full and open competition there has to be a finding under Subsection C of Section 2304 as there was with the DIA, but there was no finding at Kelly, [ESC]."

Hearing transcript, page 20.

"Even if everything DIA did was fully legitimate, Kelly (ESC) was not in a position to and didn't think it needed to and didn't make a limited competition finding, and therefore it had to proceed as it had been under full and open competition."

Hearing transcript, page 21.

My review of the statutory provisions convinces me that National Gateway's interpretation of the Competition in Contracting Act is flawed. ESC did not itself award a contract and, therefore, the provisions of 10 U.S.C. Section 2304(f)(1) providing for justification and approval of the justification of the award of a contract are simply not applicable. ESC did not purport to and did not acquire the equipment pursuant to the provisions of 10 U.S.C. Section 2304(c). It acquired the equipment pursuant to the Economy Act, 31 U.S.C. Section 1535. That Act permits the head of an agency to place an order with another agency for goods or services upon meeting the conditions specified in the Act. Presumably, the other agency would have complied with all requirements relating to fully or limited competitive bids and, thus, such a procedure should not have an adverse effect upon the government's ability to obtain goods and services at competitive prices.

In the present case the contracting officer made the findings required for compliance with 31 U.S.C. Section 1535 and 48 C.F.R. Sections 17.500, et seq.

10 U.S.C. Section 2304(a)(1) specifically exempts from the full and open competition requirements of the Competition in Contracting Act not only acquisitions described in subsection (c) but also acquisitions "expressly authorized by statute," of which The Economy Act would be one. The precise wording of the exception is "[e]xcept as provided in subsections (b), (c) and (q) *and* except in the case of procurement procedures otherwise expressly authorized by statute...." Thus subsection (c) and other statutory authorizations are separate and distinct routes which an agency may pursue without compliance with the full and open competition requirement.

National Gateway asserts that even if the Economy Act were applicable, ESC is not in compliance with 10 U.S.C. Section 2304(f)(5)(A) and section 2304(f)(5)(B). Subsection (f)(5)(A) provides that, "In no case may the head of an agency enter into a contract for property or services using procedures other than competitive procedures on the basis of the lack of advanced planning or concerns related to the amount of funds available to the agency for procurement functions."

As my previous comments have noted, in the circumstances of this case, ESC's consideration of future funding would not invalidate its decision to proceed under the Economy Act. In any event subsection (f)(5)(A) is inapplicable because by its terms it covers only the situations where the head of an agency enters into a contract. Here ESC did not enter into a contract; it obtained equipment under a contract which another agency had already entered into.

Subsection (f)(5)(B) requires that if an agency procures goods or services from another agency, the other agency must have complied with the requirements of the Competition in Contracting Act in its original procurement of the goods and services. The subsection reads: "In no case may the head of an agency ... procure property or services from another agency unless such other agency complies fully with the requirements of this chapter in its procurement of such property or services."

I will set to one side for the moment National Gateway's third ground for relief. That ground is that the DIA contract was improperly secured because the purported compliance with the applicable statute and regulations masked a prior decision to secure IBM equipment to the exclusion of everyone else. Insofar as ESC was con-

cerned, in August and September of 1988, the DIA contract was within an authorized exception to the requirements of 10 U.S.C. Section 2304(a) by virtue of 10 U.S.C. Section 2304(c)(1), which permits an exception to "full and open competition" in cases where "the property or services needed by the agency are available ... only from a limited number of responsible sources and no other type of property or services will satisfy the needs of the agency...."

DIA made the appropriate certifications justifying this exception and obtained the approvals in accordance with subsection 2304(f)(1) and applicable regulations, 48 C.F.R. Section 6.302–1. The contract was awarded and no protests were filed.

In those circumstances ESC was within its statutory authority when, acting pursuant to the Economy Act, it procured the equipment from another agency through the DIA contract. Thus National Gateway's first ground to attack the procurement, ESC's failure to meet the requirements of an acquisition under 10 U.S.C. Section 2304(c) is without merit.

We turn next to National Gateway's second ground, namely, that 40 percent of ESC's procurement was sole sourced and thus in violation of the Competition in Contracting Act. Under the regulations " 'Sole source acquisition' means a contract for the purchase of supplies or services that is entered into or proposed to be entered into by an agency after soliciting and negotiating with only one source." 48 C.F.R. Section 6.003. The DIA contract was not itself a sole source acquisition, because the solicitation was sent to a number of major manufactures of the equipment. Nor is an acquisition of equipment under the Economy Act a sole source acquisition.

National Gateway's sole source contention is based on its conclusion that approximately 40 percent of ESC's acquisition was not in fact obtained under the DIA contract but was obtained directly from IBM. In its reply brief National Gateway noted that on September 7, 1988, the Virginia Contracting Authority informed ESC that approximately eight items amounting to approximately 3 percent of the ESC list were not

available and that the total dollar value of the items on the DIA contracts was $2,658,-641.79 for the basic year, and $76,000 for the first option year.

National Gateway further noted that on September 14, 1988, DIA issued a delivery order for ESC in which the eight items were added to the DIA contract in an arrangement between the Virginia Contracting Authority and IBM; these items were to be priced subsequently.

On September 22, 1985 the aggregate price of the acquisition under the DIA was set at $3,712,684.75—a considerable increase over the September 7 figure, in fact an approximately 40 percent increase. Based on this information National Gateway stated in its Reply Brief at page 15, "... it appears that almost 40 percent of the value of the delivery order (the growth from $2,658,641.79 to $3,712,684.75) was not based on any underlying contract."

Additional information on this question was provided after the hearing. On September 7, 1988, Virginia Contracting Activity responded by letter to ESC's inquiry whether the DIA contract could support ESC's acquisition. The letter stated that except for approximately eight items, $2,638,641.75 would be the aggregate cost under the DIA contract for the equipment that had been required for the basic year under the canceled ESC solicitation. This figure, according to ESC contracting officer Smith compares very favorably with the lowest offer for like items on the canceled solicitation.

Because of the favorable prices ESC determined to increase the quantity of items it was purchasing on the first order under the DIA contract. This involved buying increased quantities of what ESC had anticipated buying the first year and it involved buying certain items earlier than originally planned. The amount reflecting the increased order was $3,712,684.75. Like the canceled solicitation, the DIA contract is a requirements contract, that is to say, a contract under which the supplier agrees to meet the government's needs rather than furnish a fixed quantity of goods.

At the time ESC's order was placed under the DIA contract it had been ascertained that only seven rather than eight items could not originally have been supported by the DIA contract and that of the seven, six had become available to be ordered under the DIA contract. The only item which the DIA contract could not support was the T-BAR 3915 Computer Peripheral Switching System, the value of which Ms. Smith had stated was minimal when compared to the totality of the order.

The $2,638,641.75 figure contained in the Virginia Contracting Activity letter did not include the price of the six items which at that time could not be supported, but Ms. Smith concluded that their eventual inclusion in the final price would not affect the decision to order under the DIA contract.

On September 14, 1988, ESC executed a purchase order which was marked on deposition as Exhibit P–9. The total price under the purchase order was $3,712,604.75.

Twenty-two of the 69 items listed in the purchase order had asterisks next to them. An asterisk meant that the price for the item had not been finally determined, but that any price agreed upon would be no greater than the General Services Administration contract with IBM.

The majority of the asterisks appeared by prices of items ESC decided to buy after finding out how good the prices were. The other asterisks appeared by some of the six items which, though not originally available, had become available under the DIA contract. None of the asterisks appeared by prices of items which were included in the aggregate dollar value for the basic year appearing in the September 7 letter.

National Gateway has concluded that the eight items which originally could not be supported by the DIA contract had grown to 22, consisting of the items in the purchase order marked with an asterisk.

It stated in its first Post–Hearing Memorandum, "Plaintiff believes that the record supports the conclusion that the growth of contract size is due to these unpriced sole source items which do not derive from the DIA contract."

National Gateway's counsel has submitted data concerning IBM GSA scheduled prices, which were supposed to set the upper limit for the prices ESC is to pay on its purchase order. He asserts that some of the asterisked items do not appear on the GSA schedule, and that some asterisked items are so expensive that they cannot be bought under the GSA contract with IBM. I conclude this data has little, if any, bearing on the determinative issue, namely, whether ESC purchased the equipment under the DIA contract.

For example, National Gateway's counsel referred to what he called the largest asterisked item, the CLIN 000IAE an IBM 3090–5656 expanded storage. Counsel asserts that this item is not priced in the IBM GSA scheduled contract. That, however, is of no moment. What is significant is that the DIA contract was modified to expressly include CLIN 000IAE–3090–5256 Expanded Storage. Thus it was possible and permissible for ESC to order it under the DIA contract.

After reviewing the additional materials submitted by the government to National Gateway, I conclude all the items on the September 14th, 1988 ESC purchase order, whether asterisked or not, are being purchased under the DIA contract. The asterisks do no more than indicate that the prices for the asterisked items have a top limit, but are to be established definitively at a later date, at which time the DIA contract would be modified to reflect the agreed upon price.

The record does not support National Gateway's charge that the 40 percent increase in the purchase price constituted a sole source acquisition by ESC because it was for equipment which was not ordered under the DIA contract.

Had there been no June, 1988 RFP, there is no reason why ESC could not in September have ordered under the DIA contract whatever amount of equipment it believed it needed. The happenstance that in September there was a validly canceled RFP did not prevent ESC from ordering under the DIA contract more equipment than it

had previously planned to acquire pursuant to the original RFP prior to its cancellation.

There is no factual or legal merit to National Gateway's contention that ESC acquired approximately 40 percent of its requirements by means of a sole source acquisition outside the DIA contract.

National Gateway's third ground for invalidating ESC's acquisition through the vehicle of the DIA contract is that the DIA contract itself was invalidly secured. It will be recalled that 10 U.S.C. Section 2304(f)(5)(B) forbids the head of an agency from procuring property from another agency unless the other agency complies fully with the requirements of the Competition in Contracting Act.

National Gateway contends, as described in somewhat more detail above, that the Virginia Contracting Authority sought to frustrate the requirements of the Act when it solicited bids for the contract and that it was engaged in a scheme to award the contract to IBM.

National Gateway concedes that the record is incomplete with regard to this claim. It seeks discovery of the circumstances of the award of the contract.

To permit National Gateway to assert and pursue this challenge to the DIA contract would, I conclude, extend the concept of standing far beyond the limits now imposed by federal courts generally and the Court of Appeals for the Third Circuit in particular.

Both constitutional and prudential considerations require limits upon those who would challenge government contracts and acceptance of bids. The Third Circuit is one of those circuits having more liberal standing rules in this context, and accords standing to a disappointed bidder. *Merriam v. Kunzig*, 476 F.2d 1233 (3rd Cir. 1973), *cert. denied, sub nom., Gateway Center Corp. v. Merriam*, 414 U.S. 911, 94 S.Ct. 233, 38 L.Ed.2d 149 (1973).

By an extension of this rule I have concluded that National Gateway has standing to challenge the cancellation of the June, 1988 RFP even though it was not the lowest bidder. By a further extension of the Third Circuit's standing rule I have concluded that National Gateway has standing to challenge ESC's decision to pursue the Economy Act route. I am not at all certain that I am correct in this regard. Certainly in the usual situation a potential vendor could not come in off the street and challenge in a private action an agency's decision to acquire equipment via the Economy Act.

In the present case, however, there is a nexus between National Gateway and the Economy Act decision. National Gateway was an unsuccessful bidder under the canceled RFP. ESC's acquisition under the Economy Act was for the same kind of equipment originally sought through the canceled RFP. With some hesitation I conclude that in this particular situation National Gateway has standing to challenge ESC's decision.

As recited above there was nothing illegal or improper about that decision. ESC was authorized under the Economy Act to effect a procurement under another agency's contract. There was nothing to suggest to ESC that the DIA contract was not lawfully and properly entered into pursuant to the limited competition provisions of 10 U.S.C. Section 2304(c).

The principal manufacturers of the equipment called for in the DIA contract were notified of the Virginia Contracting Activity's solicitation of bids. National Gateway's affiliate, PacifiCorp sought to pair with Amdahl in order to submit a bid, but did not pursue the matter when Amdahl paired with another company. The contract was awarded to IBM on August 11, 1988. No protests or other proceedings challenging the agency's action were filed. Now, in the present action, National Gateway seeks to invoke a challenge to the DIA contract in order to establish ESC's noncompliance with 10 U.S.C. Section 2304(f)(5)(B).

To permit this challenge would push the concept of standing beyond the breaking point and impermissibly extend the rulings of the Supreme Court and the Third Circuit. Assuming, as I have, that in the circumstances of this case, National Gate-

way has standing to challenge ESC's procurement under the Economy Act, that challenge cannot extend beyond ESC's own actions and knowledge. For practical as well as constitutional reasons it cannot extend to unknown misconduct leading up to the award of the DIA contract.

National Gateway's interests in the invalidation of that contract are speculative in the extreme. There is no reason to think that it would or could successfully bid on a renewed invitation to bid on the equipment covered by the DIA contract. To allow National Gateway to challenge ESC's acquisition under the Economy Act on the basis of defects in the contract of the other agency which were unknown to or undetectable by ESC at the time of the acquisition would impose an intolerable element of uncertainty on the government's procurement process. Often materials and services must be obtained on schedule and within tight time limitations. Important government services may be at stake. One can contemplate this may be particularly important when national defense and security are involved. To permit the kind of challenge which National Gateway seeks to mount here which goes beyond the conduct of the agency with which it dealt and probes into the conduct of another more remote agency with which it did not deal, creates the likelihood of impermissible uncertainty and delay.

The kind of injury to the public interest occasioned by such a challenge as described in *M. Steinthal & Co. Seamans,* 455 F.2d 1289 (D.C.Cir.1971).

This is not the situation which the Third Circuit addressed in *Merriam, supra,* where an unsuccessful bidder claimed he was deprived of a lease by the unlawful award of the lease to another. Here ESC properly canceled the RFP on which National Gateway became an unsuccessful bidder. There was nothing illegal about the RFP or its cancellation. Nor was there anything unlawful about ESC's decision to acquire equipment, most of which had been the subject of the canceled RFP, under a contract previously entered into by another agency. There was nothing to suggest to ESC that the other agency had not lawfully entered into that contract.

I conclude that *Merriam's* rationale and the rationale of the case upon which *Merriam* relied, *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970), requires a holding that National Gateway does not have standing to attack in this proceeding the validity of the DIA contract.

National Gateway's fourth ground is its claim that the ESC procurement efforts merely camouflaged an attempt to evade the requirements of the Competition in Contracting Act so as to obtain the equipment from IBM. National Gateway concedes that the record is incomplete with respect to this claim and that further discovery is needed.

I conclude that there is nothing in the record to support this claim and that in fact the record establishes that ESC's cancellation of the RFP and its procurement under the Economy Act are in full compliance with applicable statutes and regulations.

My determination that none of the four grounds upon which National Gateway relies to attack ESC's procurement has merit requires that its application for preliminary injunction be denied. Apart from the merits, other equitable considerations require denial of the application.

As recited above, the only one of the four National Gateway grounds for its invalidity claim that raises unresolved factual issues is the claim that the DIA contract was unlawfully bid. National Gateway concedes that the present record is insufficient to establish the invalidity of the DIA contract. If my conclusion that National Gateway does not have standing to assert that ground is incorrect, resolution of National Gateway's contention would require many months of discovery and a subsequent trial-like hearing. Issuance of a preliminary injunction pending resolution of the controversy would very likely inflict serious harm upon the procurement and budget programs of sensitive and important national defense agencies.

The public has a strong interest in these programs. On the other hand, there is little likelihood that National Gateway

would benefit if the DIA contract were invalidated and ESC were required to procure its equipment either through a new RFP or through a new and validly negotiated DIA contract. National Gateway was not the low bidder on the June 1988 RFP. It was unable even to make a bid for the DIA contract. The likelihood that it would succeed on a future RFP or Virginia Contracting Activity contract award is highly speculative. Balancing the unlikely advantage to National Gateway if a preliminary injunction were issued against the very likely harm to ESC in that situation, it must be concluded that the preliminary relief National Gateway seeks should be denied.

### 2. Motion for Summary Judgment:

Both the government and IBM move for dismissal or, in the alternative, for summary judgment. Since a very substantial amount of material outside the pleadings has been submitted, the motions will be treated solely as motions for summary judgment pursuant to Rule 56, Federal Rule of Civil Procedure 12(b).

Summary judgment should be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Federal Rule of Civil Procedure 56(c).

The existence of a mere scintilla of evidence in support of the non-moving party's position on a disputed question of material fact is not enough. There must be evidence on which a jury could reasonably find for the non-moving party. For example, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Each of National Gateway's four grounds for relief will be examined in the light of the summary judgment standard.

■ National Gateway's contention that ESC was prohibited by the Competition in Contracting Act from changing from a full and open competition procurement under that Act to a procurement under the Economy Act presents a pure question of law. I

have decided the question contrary to National Gateway's position and consequently summary judgment should be entered for the government and IBM and against National Gateway on that issue.

■ I have concluded that the record establishes that the ESC September 14th, 1988 purchase order provided for the acquisition of equipment under the DIA contract and that the 40 percent increases in the purchase price recited in the Virginia Contracting Activity's September 7, 1988 letter did not represent an acquisition from IBM outside the scope of the DIA contract.

National Gateway has submitted very substantial amounts of data designed to establish that the items marked with an asterisk in the September 14th purchase order represented the 40 percent increase in price over the September 7th Virginia Contracting Authority price and were for equipment not covered by the DIA contract. The data fails either to establish that fact or to create an issue of material fact. Consequently, summary judgments should be entered on the sole source acquisition claim in favor of the government and IBM and against National Gateway.

■ At this juncture in the proceedings National Gateway has not developed a record which would raise a material factual issue on its claim that the DIA contract was entered into illegally. However, it seeks further discovery, and were it in a position to challenge the DIA contract, summary judgment against it would not be appropriate at this time. Federal Ruling of Civil Procedure 56(f).

However, I have concluded that National Gateway does not have standing to challenge the DIA contract. Consequently, notwithstanding the incompleteness of discovery on this claim, summary judgment should be entered for the government and IBM and against National Gateway on that issue, since National Gateway lacks standing to raise it.

The circumstances of ESC's issuance of the June, 1988 RFP, of the subsequent cancellation of the RFP and of the decision to procure the equipment under the DIA

contract have been fully explored by way of depositions, affidavits and numerous exhibits. There is not a scintilla of evidence to show that this process was conducted in a manner at variance from the statutory or regulatory requirements or for improper motives. No rational jury could conclude that ESC's procurement efforts constituted sham compliance with the statutes and regulations. Therefore summary judgment will be granted in favor of the government and IBM and against National Gateway on the latter's claim that the procurement was an illegal effort to procure equipment from one vendor—IBM.

### 3. Other Matters:

National Gateway moved for leave to amend Count Three of its complaint to allege that ESC violated the Competition in Contracting Act by awarding the contract on less than full and open competition. The motion will be deemed to have been granted.

Count Three is the same as the first ground for relief which National Gateway articulated at the preliminary injunction hearing. Summary judgment against National Gateway has been granted on that claim.

National Gateway moved for summary judgment on the first count and on the amended third count of its complaint. Having granted summary judgment against National Gateway on its amended third count, its motion for summary judgment in its favor on that count will be denied.

Count One of the complaint alleges in general terms a violation of the full and open competition requirements of the Competition in Contracting Act and applicable regulations. To the extent this count adds anything to the more particular allegations of Count Three I have rejected it as a matter of law and National Gateway's motion for summary judgment on it will be denied.

■ National Gateway appealed from the November 15, 1988 order of the United States Magistrate denying its application to take the deposition of William Breedlove, the IBM salesman who in mid-August, 1988, advised ESC's Colonel Lilly about the existence of the DIA contract. National Gateway took Colonel Lilly's deposition and also the deposition of Ms. Smith, the ESC contracting officer, and Paul Kittle, Assistant Deputy Director for Procurement of the Defense Intelligence Agency who worked with the Virginia Contracting Activity. In addition, the government provided a large number of documents.

The United States Magistrate denied National Gateway's motion to take Breedlove's deposition but permitted it to serve a limited set of interrogatories directed to Breedlove's role, if any, in the cancellation of the June, 1988 ESC RFP.

In response to interrogatories IBM described, in some detail, the two conversations which Breedlove had with ESC personnel concerning cancellation of the RFP, both of which took place after the cancellation had been effected.

United States Magistrates have broad discretion when deciding discovery motions. Their determinations may be overturned only if there is an abuse of discretion of legal error. There was neither in this case and, consequently, the order subject to the appeal will be affirmed.

■ Finally, National Gateway moved for (i), an order compelling discovery concerning the canceled June, 1988 RFP, in particular, (a) the type of equipment upon which bids of entities other than plaintiff were based, and (b), the entity that was determined to be the lowest bidder and the amount of that entity's bid, and (ii), an order compelling discovery of information about the RFP issued by the Virginia Contracting Activity, in particular, (a), the procedure utilized in issuing the request for proposals, (b), the receipt of bids and (c), the award of said contract.

I have concluded that the undisputed facts establish as a matter of law that the June, 1988 ESC RFP was validly canceled. The information which National Gateway seeks about the bids and prices quoted under the canceled RFP is confidential and, further, it is neither relevant nor likely to lead to relevant information.

I have also concluded that National Gateway did not have standing to attack the validity of the DIA contract which the Virginia Contracting Activity entered into. There is, therefore, no reason to permit National Gateway to undertake discovery concerning its origins.

National Gateway's motion for additional discovery will be denied.

### D. *Conclusion:*

For the reasons set forth above, (i), National Gateway's motion for preliminary injunction will be denied, (ii), the government's and IBM's motions for summary judgment dismissing the complaint will be granted, and (iii), National Gateway's motion for summary judgment on Counts One and Three of its complaint will be denied, (iv), the other motions of National Gateway's appeal will be disposed of as provided above.

Counsel for the government is requested to prepare an appropriate form of order.