**COREL CORPORATION Plaintiff,**

v.

**UNITED STATES of America Defendant.**

**No. CIV. A. 99–3348 (RWR).**

United States District Court, District of Columbia.

Sept. 17, 2001.

David M. Nadler, Gilbert, Heintz & Randolph, Washington, DC, John Theodore Kotelly, Dickstein, Shapiro, Morin & Oshinsky, L.L.P., Washington, DC, for Corel Corp.

Claire M. Whitaker, U.S. Attorney's Office, Charles D. Raymond, Assoc. Sol. for Employment and Training Legal Services, Scott Glabman, Office of Sol., U.S. Dept. of Labor, Washington, DC, for U.S.

Thomas Christopher Papson, McKenna & Cuneo, L.L.P., Washington, DC, for Government Technology Services, Inc.

### MEMORANDUM OPINION

ROBERTS, District Judge.

Corel Corporation ("Corel"), a computer software manufacturer, has brought this action seeking declaratory and injunctive relief to enjoin the United States Department of Labor ("DOL") from implementing its decision to standardize its software applications exclusively to software manufactured by Microsoft Corporation ("Microsoft"). Plaintiff has filed an application for a preliminary injunction and was granted a consolidated hearing on the merits. The government has countered that this action must be dismissed because this Court lacks subject matter jurisdiction over Corel's claims and that, even if jurisdiction is proper, Corel has failed to state a claim on which relief can be granted. In the alternative, the government has moved for summary judgment based on the administrative record. Because I find that the manner in which DOL conducted its

procurement of Microsoft software neither violated the applicable federal procurement statute nor was unreasonable, the government's motion for summary judgment will be granted and Corel's motion for a preliminary injunction will be denied.

## BACKGROUND

### I. DOL's Decision to Standardize to Microsoft

In 1996, Congress passed the Federal Acquisition Reform Act and the Information Technology Management Reform Act, Pub.L. No. 104–106, 110 Stat. 659 (1996) (codified in scattered sections of 40 U.S.C. and 41 U.S.C.), which together came to be known as the Clinger–Cohen Act. The Clinger–Cohen Act required federal agencies to develop a comprehensive plan for their information technology systems and acquisitions to assure maximum efficiency in those acquisitions consistent with the agency's strategic and management goals. See 40 U.S.C.A. § 1425(d) (West Supp. 2000).

In accordance with the Clinger–Cohen Act, DOL began to reassess its information technology systems. In or around April of 1998, DOL created a Management Review Council ("MRC") to oversee DOL's information technology acquisitions and retained Abacus Technology Corporation ("Abacus") to advise the MRC. (Administrative Record ("AR") Tab 12 at 381.) Abacus subsequently issued two reports, in August and September of 1998 respectively, which assessed DOL's existing information technology infrastructure and recommended improvements. (AR Tab 61; Tab 64.) In November of 1998, the MRC created the Technical Review Board ("TRB") to serve as the MRC's first-tier review board of Abucus's findings. (AR Tab 49 at 1664–65, 1669.)

The Abacus reports revealed that DOL was operating primarily in what is known as a "best of breed" software environment, meaning that several types of software applications from various manufacturers were being used on DOL computers. (AR Tab 12 at 381–83; AR Tab 61 at 2118; AR Tab 64 at 2314–16.) For example, a given component within DOL might have been using Corel's WordPerfect for word processing, Lotus 1–2–3 for spreadsheets, and Microsoft Powerpoint for graphics design. Abacus also found that different components of DOL were not only using different brands of software products, but were also using different versions of each brand of product. (AR Tab 36 at 845–46.) For instance, some components would use Microsoft Word for their word processing while others would use Corel WordPerfect. (Id.) Of the components using WordPerfect, some would be using WordPerfect version 6.1 while others would be using the more recent WordPerfect version 8. (Id.) According to DOL, this lack of standardization resulted in continued computer problems which DOL attributed largely to lack of "interoperability" between the operating system and the software applications and a lack of "integration" between the software applications themselves. (AR Tab 12 at 383–84; Tab 12a at 392a–392q; Tab 64 at 2314–16.)

In light of these findings, the MRC decided to explore standardizing to a single office automation "suite" (i.e. a single package of applications consisting of word processing, spreadsheet, data base, and graphics design programs). (AR Tab 55 at 1839.) It instructed Abacus to collect information on available office suites and selected an evaluation team to recommend which office suite DOL should purchase. (AR Tab 36; Tab 53.) The two competing office suites identified as potentially meeting DOL's needs were Microsoft Office and Corel Office Suite. (AR Tab 12 at 387.)

Microsoft Office was the clear favorite early on and throughout the process. Abacus had recommended conversion to Microsoft Office at the outset (AR Tab 61 at 2120), although that recommendation was not included in Abacus's final report comparing Microsoft Office and Corel Office Suite. (AR Tab 36.) However, a draft justification for choosing Microsoft Office over Corel Office Suite was circulated to DOL's constituent agencies only two days after Microsoft representatives made their presentation to the DOL evaluation team on March 24, 1999. (AR Tab 41 at 1349a–1349d; Tab 42.) Corel did not make its presentation until April 15, 1999, (AR Tab 17 at 466; Tab 28 at 671–72), and provided updated cost and pricing data shortly thereafter. (AR Tab 27 at 666–67.)

On April 19, 1999, the evaluation team recommended to the TRB that Microsoft Office be chosen as DOL's standard office suite. (AR Tab 22 at 587–608.) The evaluation team's justification cited Microsoft Office's compatibility with other Microsoft products being used throughout DOL, particularly Microsoft's operating system. (*Id.* at 601.) The justification also noted the perceived superior "integration" amongst the various components of Microsoft Office (*i.e.* the word processor, spreadsheet, and data base programs all worked together smoothly). (*Id.*) The evaluation team added that Microsoft Office was the market leader in office suites, having been "installed on more than 80 percent of all personal computers" and noted that "the majority of the Department is *already using or planning* to move to Microsoft Office." (*Id.* at 601) (emphasis in original). Finally, the evaluation team asserted that a conversion to Microsoft Office would be less expensive than a conversion to Corel Office Suite. (*Id.* at 604.)

In late May or early June of 1999, the TRB concurred with the evaluation team and subsequently issued its final recommendation to the MRC on June 15. (AR Tab 12.) The TRB adopted the evaluation team's reasoning that DOL's predominant use of Microsoft's operating system, the fact that many agencies within DOL had were already using or planned to convert to Microsoft, Microsoft Office's reputation from market research as "the top-rated automation suite for the value it provides to its users," and the lower cost of converting to Microsoft as opposed to Corel all militated in favor of selecting Microsoft Office over Corel Office Suite. (*Id.* at 385.) On June 17, 1999, the MRC officially adopted the TRB's recommendation that Microsoft Office be chosen. (AR Tab 11.)

The process leading up to the MRC's final recommendation was not without controversy. Several DOL constituent agencies, particularly those that were using Corel software, roundly criticized the analysis and purported justifications for standardizing to Microsoft-only software. (AR Tab 8 at 337–44, Tab 20 at 476–84.) These agencies expressed serious concerns about the adequacy of the cost-benefit analysis that had been done and strongly questioned the soundness of Abacus's technical assessment of the benefits associated with switching completely to Microsoft. (*Id.*) Moreover, Corel repeatedly expressed its concern in writing to DOL officials regarding DOL's purported failure to comply with applicable federal procurement rules which, in Corel's view, required DOL to provide Corel with more specific information about DOL's minimum technical specifications so that Corel could make a comprehensive presentation of its product. (AR Tab 9 at 354–56; Tab 17 at 460–61.) Although not every criticism and complaint was resolved, DOL proceeded with its decision to standardize to Microsoft.

II. *DOL's Implementation of the Standardization Decision*

To implement its standardization decision, DOL obtained quotes on Microsoft

Office from several authorized resellers of Microsoft products and ultimately accepted an offer from Government Technologies Services, Inc. ("GTSI"). (AR Tab 3 at 10–12.) GTSI is a National Institute of Health ("NIH") multiple award/delivery order contractor authorized to resell brand name computer products to federal government agencies through the "Electronic Computer Store Program" operated by the NIH. The Electronic Computer Store Program is an indefinite delivery/indefinite quantity ("IDIQ") contract as well as a government-wide agency contract ("GWAC") which allows other federal agencies to place delivery orders for computer products under NIH's contract on an as needed basis.

The agreement between DOL and GTSI gives DOL the right to place delivery orders with GTSI under the NIH contract over three years at a total cost of approximately $2.8 million. (AR Tab 3A at 13.) On July 8, 1999, DOL's Office of the Assistant Secretary for Administration and Management ("OASAM") placed with GTSI a $350,000 delivery order for various Microsoft software licenses. (AR Tab 3A at 13; Tab 3B.) The entire standardization process is expected to cost DOL $22.4 million over three years. (AR Tab 11 at 376.)

### III. Corel's Failed Bid Protest and This Lawsuit

Corel responded to DOL's placement of the OASAM order by lodging a protest with the General Accounting Office ("GAO"). (Compl. at ¶ 25.) The GAO dismissed Corel's protest. See In re Corel Corp., No. B–283862 (Comp.Gen. Nov. 18, 1999).

Rebuffed by GAO, Corel filed this suit challenging the DOL's decision standardize to Microsoft Office on the ground that the decision was not made in accordance with federal procurement law and was arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706 (1994). The government then moved to dismiss or, in the alternative, for summary judgment. Corel countered by applying for a preliminary injunction to enjoin further implementation of the standardization decision and requested a consolidated hearing on the merits.[1]

In its opposition to plaintiff's motion for a preliminary injunction, DOL indicated for the first time that it would be placing another order for approximately $1 million worth of Microsoft licenses from an as yet unnamed reseller. Corel immediately moved to temporarily enjoin DOL from placing that order. Following oral argument on Corel's motion, I denied it from the bench. GTSI subsequently intervened as a defendant and Corel was permitted to take limited discovery on the issue of whether DOL had acted in bad faith by choosing Microsoft before Corel was given a fair opportunity to make its presentation to DOL. Pursuant to Federal Rule of Civil Procedure 65(a)(2), a consolidated hearing on Corel's motion for a preliminary injunction and the merits followed.

### DISCUSSION

### I. The Statutory and Regulatory Scheme

This dispute involves the sometimes arcane world of federal procurement law and, in particular, the intersection between two federal procurement statutes. The first statute, the Competition in Contract-

---

1. Corel also filed a motion to file a surreply to the government's reply in support of its motion to dismiss or, in the alternative, for summary judgment. Because I find that the argu-ments raised in Corel's surreply could have been raised in Corel's opposition brief, Corel's motion to file a surreply will be denied.

ing Act of 1984 ("CICA"), Pub.L. No. 98–369, 98 Stat. 1175 (1984) (codified at 10 U.S.C. § 2304 and 41 U.S.C. § 253), was enacted to combat wastefulness in the federal procurement process. Congress had grown concerned that federal agencies were overspending on goods and services by making noncompetitive procurements from a single vendor instead of reaping the natural cost benefits of a full and open competition among several vendors. *See* H.R. Conf. Rep. No. 861, at 1421 (1984), *reprinted in* 1984 U.S.C.C.A.N. 1445, 2109. Accordingly, CICA amended the then-existing federal procurement regime to impose a general requirement that federal government agencies solicit and procure property or services via "full and open competition through the use of competitive procedures" as described in the CICA and accompanying Federal Acquisition Regulations ("FAR"). 41 U.S.C. § 253(a)(1)(A). These competitive procedures generally require an agency to publish a notice of solicitation, specify its needs, use advanced planning and market research, avoid restrictive specifications, state the factors it will consider in assessing bids and the relative weights it will assign to those factors, conduct written or oral discussions with competitive bidders, and award the contract based on the bids as they are received or with minor clarifications. *See id.* at §§ 253a, 253b.

Despite the strong preference for full and open competition, not every government procurement must comply with CICA. An agency can avoid having to follow CICA's full and open competition rules in one of two ways. First, CICA itself contains several relatively narrow exceptions which are listed in section 253(c). For instance, under the so-called "sole source" exception, an agency may award a contract without full and open competition when "the property or services needed by the executive agency are available from only one responsible source and no other type of property or services will satisfy the needs of the executive agency." 41 U.S.C. § 253(c)(1). The FAR further provides that "[a]n acquisition that uses a brand name description or other purchase description to specify a particular brand name, product, or feature of a product, peculiar to one manufacturer does not provide for full and open competition regardless of the number of sources solicited." 48 C.F.R. § 6.302–1(c) (1999). Before an agency can engage in a "sole source" or "brand-name only" procurement, the agency's contracting officer must satisfy a series of requirements justifying and authorizing the use of noncompetitive procedures. *See* 41 U.S.C. § 253(f); 48 C.F.R. §§ 6.303–1, 6.303–2, 6.304, 6.305. Once the contracting officer jumps through these statutory and regulatory hoops, the procurement may proceed on a noncompetitive basis.

The second way for an agency to exempt itself from CICA is to procure goods or services in accordance with another federal procurement statute. In a savings clause, CICA specifies that its open competition requirements do not apply "in the case of procurement procedures expressly authorized by statute." 41 U.S.C. § 253(a)(1). Thus, the exceptions contained in CICA itself and those contained in other procurement statutes "are separate and distinct routes which an agency may pursue without compliance with the full and open competition requirement." *National Gateway Telecom, Inc. v. Aldridge,* 701 F.Supp. 1104, 1113 (D.N.J.1988), *aff'd,* 879 F.2d 858 (3d Cir.1989).

CICA's savings clause implicates the other relevant procurement statute in this case—the Federal Acquisition Streamlining Act of 1994 ("FASA"), Pub.L. No. 103–355, 108 Stat. 3409 (codified in scattered sections of 10 U.S.C. and 41 U.S.C.). En-

acted a decade after CICA, FASA was intended, as its name suggests, to streamline and simplify federal acquisition procedures. *See* S.Rep. No. 103–259, at 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 2598, 2598. FASA was the product of Congress' conclusion that the entire federal procurement regime had become a "complex and unwieldy system." S.Rep. No. 103–258, at 2 (1994), *reprinted in* 1994 U.S.C.C.A.N. 2561, 2563. CICA's open competition requirements often had the unintended effect of bogging down the federal procurement process in innumerable bid protests filed by the losing bidder who almost invariably claimed that the agency's award of a contract to a competitor was not made on a fully competitive basis. *See* S.Rep. No. 103–259, at 7, *reprinted in* 1994 U.S.S.C.A.N. 2598, 2604.

Of chief relevance here is FASA's streamlining of procurement via so-called "indefinite quantity contracts" which are also known as "task or delivery order contracts." 48 C.F.R. §§ 16.501–1, 16.501–2. Task and delivery order contracts, of which the NIH's Electronic Computer Store Program is an example, essentially create a menu of goods or services of an indefinite quantity that can be ordered by an agency on an as needed basis. *See* 41 U.S.C.A. § 253k (West Supp.2000); 48 C.F.R. § 16.501–1.[2] Importantly, FASA also provides that when an agency makes an order pursuant to a task or delivery order contract, the agency is not required to publish a notice of solicitation nor is it required to hold a "competition . . . that is separate from that used for entering into the contract." 41 U.S.C.A. at § 253j(a)(2); *see also* 48 C.F.R. § 6.001(f) (exempting from CICA and FAR's open competition requirements "[o]rders placed against task

order and delivery order contracts entered into pursuant to subpart 16.5."). In other words, once the task or delivery order contract itself has been obtained through full and open competition, orders made pursuant to that contract are immune from CICA's full and open competition requirements. FASA also contains a nonreviewability clause which bars bid protests connected to orders placed under task or delivery order contracts "except for a protest on the ground that the order increases the scope, period or maximum value of the contract under which the order is issued." *Id.* at § 253j(d). In sum, these provisions work to streamline the federal procurement process by allowing agencies to create menus of goods and services through full and open competition, and by preventing disappointed bidders in most instances from protesting the orders that agencies make from those menus.

## II. *Corel's Complaint and Motion for a Preliminary Injunction*

Corel has brought this action arguing that DOL failed to comply with CICA because DOL did not competitively solicit proposals from office suite manufacturers nor did it justify and authorize the use of noncompetitive procedures. In Count I of its five-count complaint, Corel alleges that DOL's decision to standardize its office automation suite to Microsoft products was arbitrary and capricious in violation of APA, CICA, the FAR, and the North American Free Trade Agreement ("NAFTA") as implemented by the FAR. In Counts II and III, Corel alleges that DOL's purchase of Microsoft-only products constituted a improper sole source award and restriction on competition. Count IV

---

**2.** The NIH's Electronic Computer Store Program is a delivery order contract because it creates a menu of goods; task order contracts create a menu of services. *See* 48 C.F.R. § 16.501–1.

alleges that DOL unlawfully bundled its office automation suite with its operating system. Count V alleges that DOL failed to comply with the NAFTA-implementing provisions contained in the FAR because DOL unfairly favored Microsoft, an American company, over Corel, a Canadian company.

■ To be entitled to the preliminary injunctive relief it now seeks, Corel "must show 1) a substantial likelihood of success on the merits, 2) that it would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction." *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C.Cir.1998) (internal quotations and citation omitted); *see also Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir. 1977). As the D.C. Circuit has held, "[t]hese factors interrelate on a sliding scale and must be balanced against each other." *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C.Cir.1998). However, there is no need to proceed past the first step of the preliminary injunction analysis if the government's dispositive motion should be granted. Accordingly, I will address that motion first.

III. *Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment*

The government and GTSI[3] argue that this action must be dismissed for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), or for failure to state a claim under Rule 12(b)(6). In the alternative, the government and

GTSI maintain that summary judgment must be entered in their favor based on the administrative record. Before I address the government and GTSI's arguments on the merits, I must consider their jurisdictional challenge.

A. *Motion to Dismiss for Lack of Subject Matter Jurisdiction Under Rule 12(b)(1)*

■ In deciding a motion to dismiss, the court must draw all inferences from the facts alleged in the complaint in the plaintiff's favor. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). For the purposes of Rule 12(b)(1), it is the plaintiff's burden to establish by a preponderance of the evidence that subject matter jurisdiction exists. *See Fitts v. Federal Nat'l Mortgage Ass'n*, 44 F.Supp.2d 317, 320 (D.D.C.1999) (citations omitted), *aff'd*, 236 F.3d 1 (D.C.Cir.2001).

The government and GTSI maintain that Corel has failed to meet its burden because DOL procured its Microsoft software licenses from GTSI by placing orders under an indefinite delivery contract governed by FASA. DOL argues, as it did with success before the GAO, that CICA's savings clause coupled with FASA's nonreviewability clause preclude review of the DOL's standardization decision because any order DOL places under the NIH contract is generally unreviewable. In dismissing the Corel's protest, the GAO reasoned:

> [W]hether DOL's issuance of the delivery order to GTSI is tantamount to the award of a contract on a sole source basis is irrelevant. The vehicle by which DOL has elected to purchase the Microsoft products is a delivery order

---

**3.** Because GTSI's motion to intervene was granted shortly before the scheduled consolidated hearing on Corel's motion for a preliminary injunction and on the merits, GTSI was not allowed to file any briefs. However, GTSI supplemented the government's presentation at oral argument.

issued under an indefinite-delivery, indefinite-quantity contract operated by NIH, so that our Office, by virtue of the statutory restriction on protests set forth at 41 U.S.C. § 253j(d), is without authority to consider protests connected to the issuance of delivery orders, regardless of the propriety of the issuing agency's underlying determinations or conduct (absent certain exceptions not applicable here).

*In re Corel Corp.*, No. B–283862 at 2. Accordingly, because Corel was protesting a specific order placed under a delivery order contract, FASA's bar against bid protests deprived the GAO of authority to review the underlying justification for DOL's placement of the order.

Putting aside the issue of whether DOL's standardization decision is reviewable under the APA, a topic to which I shall return, the government's and GTSI's argument that FASA deprives this Court of subject matter jurisdiction misconceives the nature of Corel's complaint. Corel is not protesting the issuance of an individual delivery order that is exempt from review under FASA. Instead, Corel has filed a complaint for declaratory and injunctive relief challenging DOL's overarching administrative decision to standardize to Microsoft Office in the first place, claiming that DOL failed to comply with CICA and the FAR during that process.

■ Under these circumstances, jurisdiction is proper under either 28 U.S.C. § 1331 or the Tucker Act, 28 U.S.C. § 1491. District courts have federal question jurisdiction over cases "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. "It is hornbook law that a complaint need only contain an allegation of a non-frivolous

claim made under a federal law in order to defeat a motion to dismiss for lack of subject matter jurisdiction." *York Assocs., Inc. v. Secretary of Housing and Urban Dev.*, 815 F.Supp. 16, 20 (D.D.C.1993) (citing *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). Here, Corel has alleged violations of CICA and injury under the APA. These allegations are sufficient to establish federal question subject matter jurisdiction.

■ Corel has also cited the Tucker Act as a basis for jurisdiction. (Compl. at ¶¶ 5–6.) That statute gives district courts authority "to render judgment on an action by an interested party . . . [involving] any alleged violation of a statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). The Federal Circuit has noted that "[t]he operative phrase 'in connection with' is very sweeping in scope. As long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction." *RAMCOR Servs. Group, Inc. v. United States*, 185 F.3d 1286, 1289 (Fed.Cir.1999). Because Corel has alleged that DOL's standardization decision violated CICA and that decision was "in connection with" its ultimate procurement of Microsoft software licenses, Corel has satisfied this aspect of the Tucker Act's jurisdictional requirements.

■ I also find that Corel is an "interested party" as contemplated by the Tucker Act. Although the Tucker Act does not specifically define the term "interested party,"[4] the Federal Court of Claims, which regularly adjudicates government contracting cases, has repeatedly found that "to be an 'interested party' under the Tucker Act, a 'plaintiff must stand in some

---

4. The *GAO* statute defines "interested party" as "an actual or prospective bidder or offeror whose direct economic interest would be af-

fected by the award of the contract or by failure to award the contract." 31 U.S.C.A. § 3551(2) (West Supp.2000).

connection to the procurement, and it must have an economic interest in it.'" *Phoenix Air Group, Inc. v. United States,* 46 Fed. Cl. 90, 102 (2000) (quoting *CCL, Inc. v. United States,* 39 Fed. Cl. 780, 790 (1997)), *appeal dismissed by agreement,* 243 F.3d 555 (Fed.Cir.2000).[5] Moreover, "where a claim is made that the government violated CICA by refusing to engage in a competitive procurement, it is sufficient for standing purposes if the plaintiff shows that it likely would have competed for the contract had the government publicly invited bids or requested proposals." *CCL, Inc.,* 39 Fed. Cl. at 790. Here, Corel has made the requisite showing by alleging that DOL refused to engage in a competitive procurement for its office automation systems and that, had such a competition been held, Corel would have submitted a bid. Indeed, Corel did submit a bid to DOL even though DOL purports never to have engaged in a formal solicitation under CICA. Corel therefore has standing to bring its claims that DOL violated CICA and in turn acted arbitrarily and capriciously under the APA.

**B.** *Motion to Dismiss for Failure to State a Claim Under Rule 12(b)(6) or, in the Alternative, for Summary Judgment Under Rule 56*

DOL's motion to dismiss for failure to state a claim is an adaptation of its jurisdictional challenge. DOL maintains that, even if the initial decision to standardize to Microsoft can be divorced for jurisdictional purposes from its subsequent decision to implement the standardization via an in-

definite delivery contract, Corel has nevertheless failed to state a claim on which relief can be granted because DOL's decision to standardize to Microsoft was an internal policy decision unconnected to any reviewable procurement action.

I must resolve this issue under Rule 56 of the Federal Rules of Civil Procedure because I have considered matters outside of the pleadings, most notably the administrative record, in reaching my decision. *See* Fed.R.Civ.P. 12(b). Rule 56 provides that summary judgment is proper when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Because this case involves review of the administrative record, it raises questions of law for which summary judgment is appropriate. *See Richards v. INS,* 554 F.2d 1173, 1177 n. 28 (D.C.Cir.1977).

### 1. *Applicable Law*

This case turns on a determination of what law applies, if any, to DOL's decision to standardize to Microsoft. It is undisputed that the procurement vehicle DOL used to implement its standardization decision is a delivery order contract governed by FASA. However, the parties vehemently disagree about whether DOL was required to justify its pre-delivery decision to standardize to Microsoft in accordance with the CICA and its implementing regulations in the FAR.

■ My review of the relevant statutory and regulatory provisions convinces me

---

**5.** The government cites *Phoenix Air Group* for the proposition that this Court lacks subject matter jurisdiction over Corel's claims. However, the Court of Claims expressly declined to dismiss that case for lack of subject matter jurisdiction even though a task order contract was involved. *See Phoenix Air Group,* 46 Fed. Cl. at 100–03. The court instead ruled that

because the plaintiff had invoked CICA and was an interested party, the court had jurisdiction under the Tucker Act to decide the case on cross-motions for summary judgment on the administrative record. *See id.* at 103. Accordingly, *Phoenix Air Group* supports this Court's jurisdiction.

that DOL was not required to comply with CICA when it decided to standardize to Microsoft. It is well-settled that CICA applies only the "procurement" of goods and services by the federal government. Although neither CICA nor the FAR define "procurement," courts within this Circuit and elsewhere have accorded the term its natural meaning—"the process by which the government pays money or confers other benefits in order to obtain goods and services from the private sector." *Rapides Regional Med. Ctr. v. Secretary, Dep't of Veterans' Affairs,* 974 F.2d 565, 573 (5th Cir.1992), *cert. denied,* 508 U.S. 939, 113 S.Ct. 2413, 124 L.Ed.2d 636 (1993); *see also Saratoga Dev. Corp. v. United States,* 21 F.3d 445, 453 n. 2 (D.C.Cir.1994); *Grigsby Brandford & Co., Inc. v. United States,* 869 F.Supp. 984, 997 (D.D.C.1994) (stating that "federal procurement laws and regulations, such as CICA and the FAR, apply only when an agency . . . acts as a commercial purchaser of goods and services"). However, the term "procurement" as used in CICA has been held not to refer to "all stages of the process of acquiring property or services, beginning with the process of determining the need for property or services and ending with contract completion and closeout[.]" *Rapides,* 974 F.2d at 573; *see also Saratoga Dev. Corp.,* 21 F.3d at 453 & n. 2. CICA therefore has no application to government decisions which do not involve the actual purchase of a good or service, nor does CICA apply when the government is merely purchasing a good or service to which the government already possesses a right. *See, e.g., Health Sys. Architects, Inc. v. Shalala,* 992 F.Supp. 804, 809 (D.Md.1998) (holding that decision by the Health Care Financing Administration ("HCFA") to standardize Medicare intermediaries' claims processing systems to one type of computer software was not governed by CICA or the FAR because

the HCFA already possessed "an unlimited irrevocable license in both [prospective] software systems through its previous contracts with the [fiscal intermediaries]").

More importantly, CICA's savings clause specifically provides that CICA's full and open competition requirements do not apply "in the case of procurement procedures otherwise expressly authorized by statute . . . ." 41 U.S.C. § 253(a)(1). Thus, the D.C. Circuit has held that the government's choice of a contractor to construct a building in Washington's "Federal Triangle" at the contractor's own cost was not a "procurement" governed by CICA because: (1) the choice of a contractor did not actually involve an immediate purchase of anything even though the government would later pay for the development through rent, and (2) CICA's requirements were supplanted by the procurement procedures set forth in the Federal Triangle Development Act of 1987. *See Saratoga Dev. Corp.,* 21 F.3d at 452–46. Likewise, in a case bearing some striking factual similarities to this one, the District Court for the District of New Jersey held that the Air Force's decision to purchase computer equipment from IBM was not governed by CICA because the Air Force made its procurement by placing an order under a requirements contract that had previously been awarded to IBM by another agency in accordance with the Economy Act, 31 U.S.C. § 1535. *See National Gateway Telecom,* 701 F.Supp. at 1113. The court reasoned that the Economy Act displaced CICA's full and open competition requirements because "[p]resumably, the other agency would have complied with all requirements relating to fully or limited competitive bids and, thus, such a procedure should not have an adverse effect upon the government's ability to obtain goods and services at competitive prices." *Id.*

These authorities lead me to conclude that DOL's decision to standardize to Microsoft was not a procurement action governed by CICA. Regardless of whether the MRC's pre-delivery decision to standardize to Microsoft is properly classified as a "procurement" decision to which CICA might apply, DOL subsequently elected to utilize procurement procedures expressly authorized by FASA rather than engage in a full and open competition under CICA. FASA specifically provides that, when an agency issues a task or delivery order under an indefinite delivery contract, the agency is not required to conduct a "competition (or a waiver of competition approved in accordance with section 253(f) of this title) that is separate and apart from that used for entering into the contract." 41 U.S.C.A. § 253j(a)(2). In addition, FASA's implementing regulations in the FAR state in relevant part that "[t]he procedures for selecting awardees for the placement of particular orders need not comply with the competition requirements of part 6." 48 C.F.R. § 16.505(b). The reference to "part 6" is to the FAR's procedures for noncompetitive procurements, including sole source and brand-name only acquisitions. Likewise, FAR 6.001 explicitly exempts from its requirements "[o]rders placed against task and delivery order contracts pursuant to subpart 16.5." 48 C.F.R. § 6.001(f). Accordingly, just as in the *National Gateway Telecom* case, CICA is inapplicable here because DOL procured its computer equipment pursuant to a different procurement statute which expressly authorizes the placement of orders under contracts previously awarded by another agency.

Corel argues that the GAO's decision in *In re Valenzuela Engineering, Inc.*, B–277979, 1998 WL 53921 (Comp.Gen. Dec.9, 1997), suggests otherwise. The bid protest in that case was brought by an engineering company that had been awarded a contract through the Small Business Administration to provide operation and maintenance services to the Air Force. *See Valenzuela Engineering*, 1998 WL 53921, at *6. The Air Force subsequently decided not to exercise its option to continue that contract and instead placed task orders for the same services under an IDIQ contract similar in nature to the NIH contract in this case. *See id.* at *7. Valenzuela then filed a protest claiming that the Air Force's decision had violated various FAR sections which implemented a provision of the Small Business Act, 15 U.S.C. § 644(a). *See id.* at *8.

The GAO dismissed the protest as untimely, but opined in a footnote in a subsequent letter to the Secretary of the Air Force that the Air Force's decision to proceed under the Economy Act did not exempt the Air Force from the requirements of FAR provisions implementing the Small Business Act. *See id.* at *9 n. 1. Specifically, the GAO rejected at the outset the Air Force's contention that the placement of an order under an IDIQ contract exempted the entire transaction from CICA and the FAR, reasoning that the Air Force's placement of task order did in fact constitute an "acquisition" resulting in the placement of a "contract" as defined by FAR 2.101.[6] *See id.* The letter then noted that

**6.** FAR 2.101 states that an "[a]cquisition begins at the point when agency needs are established and includes the description of requirements to satisfy agency needs, solicitation and selection of sources, award of contracts, ... and those technical and management functions directly related to the process of fulfilling agency needs by contract." 48 C.F.R. § 2.101. A "contract" as defined by the FAR 2.101 is "a mutually binding legal relationship obligating the seller to furnish supplies or services ... and the payer to pay for them." *Id.* "Contracts" include "orders, such as purchase

while "Economy Act transactions are generally exempted from the competition requirements contained in [CICA] and FAR[,][t]here is no similar exemption from the requirements of the Small Business Act and its implementing regulations." *Id.* at *1 (footnote omitted).

This last statement is critical because it highlights the key distinction between *Valenzuela Engineering* and *National Gateway Telecom* overlooked by Corel's argument. The Small Business Act is nowhere to be found in the *National Gateway Telecom* case. *National Gateway Telecom* simply stands for the fundamental proposition, echoed by the GAO in *Valenzuela Engineering*, that Economy Act transactions (like FASA transactions) are generally exempted from CICA's full and open competition requirements.[7] The *Valenzuela Engineering* opinion and letter in no way suggest that CICA or its implementing provisions in the FAR apply to decisions underlying the placement of a task or delivery orders under the Economy Act or, by analogy, FASA. Indeed, such a holding would not only contradict *National Gateway Telecom*, but also the GAO's conclusion in this very matter that "whether DOL's issuance of the delivery order to GTSI is tantamount to the award of a contract on sole source basis [under CICA] is irrelevant" in light of DOL's decision to conduct its procurement under FASA. *In re Corel Corp.*, No. B–283862, at 2.

■ In the face of the plain language of CICA, FASA, and the FAR, Corel is left to argue that FASA should not be construed to mean what it says. Corel maintains that FASA did not anticipate the

proliferation of GWACs which—like the NIH contract—permit agencies to enter into indefinite delivery contracts with retailers such as GTSI instead of manufacturers such as Corel and Microsoft. Corel may very well have identified an anomaly created by FASA which exempts federal agencies from having to conduct a full and open competition amongst manufacturers so long as the agency previously conducted a full and open competition amongst retailers. However, the portions of FASA's legislative history relied upon by Corel do not squarely address this point, *see* H.R. Conf. Rep. No. 103–712, at 178 (1994), *reprinted in* 1994 U.S.C.C.A.N. 2607, 2608, and without firmer evidence of congressional intent to the contrary, I lack the authority to rewrite what are otherwise unambiguous statutory, as well as regulatory, provisions. *See, e.g., Eagle–Picher Indus., Inc. v. U.S. EPA*, 759 F.2d 922, 929 (D.C.Cir.1985) (holding that there must be "very clear legislative history indicating that Congress has an intent contrary to that expressed in the statute" to justify "departing from the clear language and structure of the statute"). If Corel is convinced that the proliferation of GWACs in the wake of FASA's passage has created a gaping and unintended loophole in CICA, the appropriate audience for such a complaint is Congress, not this Court.

Corel's remaining argument that CICA should have applied to DOL's standardization decision is found in the administrative record itself in an exchange of memoranda between Edward Hugler, DOL's Assistant Secretary for Information Technology, and Patricia W. Lattimore, DOL's Assistant Secretary for Administration and Manage-

---

orders, under which the contract becomes effective by written acceptance or performance" *Id.*

7. The GAO did state in its letter that the Air Force had violated CICA in its award of the

IDIQ contract itself. *See Valenzuela Engineering*, 1998 WL 53921 at *2. However, Corel has not alleged that the award of the NIH contract in this case violated CICA.

ment. On April 19, 1999, the same day that the evaluation team recommended to the TRB that Microsoft Office be chosen, Mr. Hugler sent a memorandum to Ms. Lattimore requesting authorization from the DOL's Procurement Review Board ("PRB") to conduct a "Sole Source Procurement of Microsoft Enterprise Agreement." (AR Tab 21 at 547.) The memorandum cites the attached Form "DL Form 1–490" which appears to be the form DOL uses to authorize sole source procurements. (*Id.*) Ms. Lattimore replied to Mr. Hugler in a memorandum dated June 2, 1999 and entitled "Sole Source Agreement With Microsoft Corporation." (AR Tab 14.) In that memorandum, Ms. Lattimore warned Mr. Hugler that the proposed procurement of Microsoft Office had to be justified and authorized in accordance with CICA and the FAR's name brand-only procurement rules. Ms. Lattimore wrote:

> FAR Section 6.302–1(c) states that an acquisition that uses a brand name description or other purchase description to specify a particular brand name, product, or feature of a product, peculiar to one manufacturer does not provide for full and open competition *regardless of the number of sources solicited.* Therefore, review by the Board is appropriate to ensure the selection of Microsoft products and services is justified because it restricts competition to one brand name.

(*Id.* at 397) (emphasis in original). According to Corel, these contemporaneous representations by two DOL officials intimately involved in the standardization process demonstrate that DOL understood that the CICA and FAR's sole source and/or brand-name only requirements were fully applicable to the DOL's standardization decision.

■ Based on my review of the record, I cannot conclude that the government's litigation position is a post-hoc rationalization as Corel contends. Federal procurement law has been aptly described by the D.C. Circuit as "a tangle of complex statutory and decisional rules." *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1302 (D.C.Cir.1971). To the extent Mr. Hugler and Ms. Lattimore construed how those rules would apply to the DOL's ultimate procurement decision, they were simply mistaken. It also bears reiterating that the correspondence between Hugler and Lattimore occurred before DOL made its ultimate decision to procure Microsoft products under FASA instead of CICA. Thus, I will not hold that CICA applied to the DOL's pre-delivery decision to standardize to Microsoft simply because two DOL officials believed at one point prior to the ultimate procurement decision that CICA would apply.

My conclusion that CICA is inapplicable dispenses with Corel's claims under NAFTA as well. Corel has asserted that it has not based any of its claims on NAFTA itself, but rather on "the specific requirements of CICA and the FAR" which implement CICA's competition requirements for eligible offerors from Mexico and Canada. (Pl.'s Opp'n to Def.'s Mot. to Dismiss or, in the Alternative, for Summ. J. at 26) (citing 48 C.F.R. § 25.405). However, because CICA does not apply to DOL's standardization decision, neither do the FAR provisions that implement CICA's competition requirements. Corel's NAFTA-based claims therefore suffer the same fate as Corel's claims under CICA.

In sum, I find that DOL was under no duty to hold a full and open competition in accordance with CICA when it was deciding between office suites. Because DOL ultimately conducted its procurement in accordance with FASA, DOL also was not

required to justify and authorize its procurement of Microsoft software in accordance with CICA's sole *source* or *name-brand only* rules. Accordingly, the government's motion for summary judgment on Corel's claims brought under the CICA and FAR will be granted.

### 2. *Reviewability Under the APA*

Since I have concluded that CICA is inapplicable to the DOL's decision to standardize its computer systems to Microsoft, there is a serious question as to whether the standardization decision can be subjected to review under the APA. "The APA establishes a 'presumption of judicial review' at the behest of those adversely affected by agency action." *Kreis v. Secretary of the Air Force*, 866 F.2d 1508, 1513 (D.C.Cir.1989) (citation omitted). However, the APA also provides that the presumption of judicial review is rebutted in two circumstances: (1) when "statutes preclude judicial review"; or (2) when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(1)-(2).

The government and GTSI argue that both exceptions apply here. First, they maintain that APA review is precluded by statute because FASA bars bid protests in connection with the issuance of a task or delivery orders. *See* 41 U.S.C.A. § 253j(d). The GAO ruled that section 253j(d) of FASA prevented the GAO from reviewing the underlying rationale for DOL's procurement decision.[8] The government and GTSI maintain that, if a disappointed bidder is then allowed to rush into federal court seeking APA review of the underlying justification for the issuance of a task or delivery order, the efficiencies gained from the FASA's ban on bid protests would be eviscerated.

Second, the government and GTSI argue that DOL's standardization decision was also "committed to agency discretion by law." This exception to the presumption of APA review applies "even when Congress has not affirmatively precluded judicial oversight, [because] 'review is not to be had if the statute is so drawn that a court would have no meaningful standard against which to judge the agency's exercise of discretion.' " *Webster v. Doe*, 486 U.S. 592, 599–600, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985)); *see also Varicon Int'l v. Office of Personnel Mgmnt.*, 934 F.Supp. 440, 443–44 (D.D.C.1996). The government and GTSI argue that if CICA does not apply in this case, as I have found, then there is no meaningful statutory standard against which I can judge whether the agency's decision was arbitrary and capricious under the APA.

I find the government's first argument particularly convincing, and the second may also have merit. Although this Court has subject matter jurisdiction to decide whether DOL violated CICA, once it is determined that FASA preempts CICA, FASA's bar against bid protests would appear to preclude review of the administrative decisions leading up to the procurement. *See Phoenix Air Group*, 46 Fed. Cl. at 105 (noting that analogous provision to section 253j(d) in Armed Services Procurement Act, 10 U.S.C. § 2304c(d), limited the types of challenges that can be made to the agency's decision when the procurement is made with a task or delivery order). Moreover, the APA merely establishes a standard of review for determining whether there has been a depriva-

---

8. Courts in this Circuit treat the GAO's findings "as an expert opinion" deserving of "prudent" consideration, but not mandatory deference. *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 201 (D.C.Cir.1984).

tion of an independent statutory right. *See Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977); *Cobell v. Babbitt*, 91 F.Supp.2d 1, 29 (D.D.C. 1999), *aff'd*, 240 F.3d 1081 (D.C.Cir.2001). CICA's inapplicability would presumably deprive Corel of the statutory "hook" for its APA claims, in turn implying that the standardization decision was committed to the agency's discretion.[9] I need not definitively resolve these questions, however, because even if the DOL's standardization decision is reviewable, I find that it was not arbitrary and capricious.

### 3. *APA Arbitrary and Capricious Review*

In disappointed bidder cases, the government is entitled to "an especially deferential version of arbitrary and capricious review" under section 706(2)(A) of the APA. *Iceland Steamship Co., Ltd. v. United States Dep't of the Army*, 201 F.3d 451, 457 (D.C.Cir.), *cert. denied*, 529 U.S. 1112, 120 S.Ct. 1967, 146 L.Ed.2d 798 (2000). Under this standard, Corel bears the " 'heavy burden' of showing either that (1) the procurement official's decisions on matters committed primarily to his own discretion had no rational basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations.' " *Irvin Indus. Canada, Ltd. v. United States Air Force*, 924 F.2d 1068, 1072 (D.C.Cir.1990) (quoting, among other authorities, *Kentron Hawaii Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C.Cir.1973)). Courts demand no more than "substantial compliance with applicable law and baseline substantive rationality [because] '[j]udges are ill-equipped to settle delicate questions involving procure-

ment decisions.' " *Elcon Enters., Inc. v. Washington Metro. Area Transit Auth.*, 977 F.2d 1472, 1479 (D.C.Cir.1992) (quoting *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 203 (D.C.Cir.1984) (second internal quotation and citation omitted)). Accordingly, "the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *M. Steinthal & Co.*, 455 at 1303.

Corel argues that DOL's decision to standardize to Microsoft was both an illegal sole source procurement and substantively irrational. With respect to the former contention, I have already found the CICA and the FAR are inapplicable because DOL made its procurement under FASA. Accordingly, Corel has not met its burden of proving a clear violation of any applicable procurement statute or regulation, let alone a prejudicial one.

Corel argues that DOL's standardization decision was irrational for two principle reasons. First, Corel contends that is was arbitrary and capricious for DOL not to consider Microsoft's status as a monopolist and purported violator of antitrust laws. Second, Corel attacks DOL's purported technical and economic justifications for choosing Microsoft over Corel. These arguments do not sustain Corel's "heavy burden."

### a. *Failure to Consider Microsoft's Monopoly*

According to Corel, by choosing to standardize to Microsoft Office, DOL thumbs its nose at Judge Jackson's ruling that

---

**9.** This argument might be defeated by the language of the Tucker Act itself, which provides that whenever a court exercises jurisdiction under that statute, the challenged agency action is to be reviewed "pursuant to the standards set forth in [the APA]." 28 U.S.C. § 1491(b)(4). Because Corel has not made this argument, I will not contemplate it further.

Microsoft violated antitrust laws by anticompetitively "bundling" software applications with its Windows operating system. In Count IV of its complaint, Corel alleges that DOL's own bundling of its requirement for an office suite and operating system improperly excluded Corel from competition because Corel does not manufacture an operating system. (Compl. at ¶¶ 37–39.) Corel further contends that it was Microsoft's anticompetitive activity which created the market environment that led DOL to conclude that Microsoft would provide the best "handshake" between the Microsoft operating system and Microsoft software applications. DOL thus had a duty, according to Corel, to at least consider Microsoft's predatory practices as part of its analysis, particularly because Microsoft could face debarment for violating the antitrust laws.

█ I am unpersuaded that DOL's purported failure to consider the implications of the *Microsoft* case necessarily renders DOL's decision irrational. As the government notes, Judge Jackson handed down his final decision in *United States v. Microsoft*, 97 F.Supp.2d 59 (D.D.C.2000), long after DOL officially decided to standardize to Microsoft in June of 1999. Indeed, none of Judge Jackson's decisions in the *Microsoft* case were issued prior to June of 1999.[10] Even if the remedies that Judge Jackson's final order imposed had not been vacated on appeal,[11] customers such as DOL would not have been barred from purchasing Microsoft's operating system and software. Though Microsoft would

have been broken into two companies, one selling the operating system and the other selling software applications, *see United States v. Microsoft*, 97 F.Supp.2d at 64, there was nothing in the divestiture order that would have prevented DOL from making its operating system and software procurements solely from Microsoft's spun-off companies so long as DOL complied with the applicable procurement statute and regulations. I therefore agree with the government that the relevance of the *Microsoft* case is negligible.[12]

b. *Economic and Technical Justifications*

Corel's second line of attack against the DOL's rationale for choosing Microsoft deserves more extended discussion than the first. Before assessing the merits of Corel's economic and technical arguments, I must initially determine the scope of material I may properly consider in my substantive review of DOL's decision.

Corel has submitted lengthy declarations authored by Dr. David DeRamus, a retained economist, which attack each of the purported justifications DOL offered in support of its decision to standardize to Microsoft. The government has moved to strike the DeRamus declarations, noting that review of an agency's actions is normally limited to an examination of the administrative record. *See Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (*per curiam*) ("[T]he focal point for judicial review should be the

---

**10.** Judge Jackson issued his findings of fact on November 5, 1999, *see United States v. Microsoft*, 84 F.Supp.2d 9 (D.D.C.1999), and conclusions of law on April 3, 2000. *See United States v. Microsoft*, 87 F.Supp.2d 30 (D.D.C.2000).

**11.** *See United States v. Microsoft Corp.*, 253 F.3d 34 (D.C.Cir.2001), *petition for cert. filed*, (U.S. Aug. 7, 2001).

**12.** I also take judicial notice of the fact that this case was originally assigned to Judge Jackson as related to the *Microsoft* case. However, Judge Jackson reassigned this case to the Calendar Committee after he concluded that it was unrelated to the *Microsoft* litigation.

administrative record already in existence, not some new record made initially in the reviewing court."). I agree that the declarations must be stricken.

■ There are several exceptions to the general rule that courts should limit their review to the administrative record. The D.C. Circuit has held that supplemental evidence may be properly admitted in the following circumstances:

(1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

*Esch v. Yeutter,* 876 F.2d 976, 991 (D.C.Cir.1989) (footnote omitted). However, these exceptions should not be construed to swallow the rule that extrinsic evidence is generally inadmissible, particularly when the extrinsic evidence is argumentative as opposed to explanatory. Put another way, "[c]ourts admit outside evidence primarily as a means of requiring an agency to explicate its own reasoning when the record is unclear." *National Treasury Employees Union v. Hove,* 840 F.Supp. 165, 168 (D.D.C.1994) (citing authorities), *aff'd,* 53 F.3d 1289 (D.C.Cir.1995).[13] Courts may also consider outside evidence when "the subject matter of the original record upon which the agency based its decision was highly technical." *Id.* (citation omitted).

■ Although the subject matter of this case does have a highly technical aspect, Dr. DeRamus's declarations are not primarily explanatory in nature. The first sentence of the declaration he submitted in support of Corel's motion for a preliminary injunction quite accurately encapsulates the purpose and nature of his submissions. That sentence reads, "At the request of [plaintiff's counsel], I have prepared this report to *assess the technical and financial merits* of the decision by the Department of Labor ("DOL") to standardize on and buy only Microsoft ... Office as the office productivity software suite for all DOL agencies and users." (Second DeRamus Decl. at ¶ 1) (emphasis added). Dr. DeRamus then does as promised, first attacking the merits of each justification for DOL's choice to standardize to Microsoft, then conducting his own cost-benefit analysis from which he concludes that DOL should have chosen Corel Office Suite. However, Dr. DeRamus's analysis does not add factors that DOL failed to consider as much as it questions the manner in which DOL went about considering the factors it

13. In this regard, I permitted Corel to depose Edward Hugler and Bruce Eanet, two DOL officials heavily involved in the standardization decision, after finding that Corel had made a substantial enough showing to justify discovery on the issue of whether DOL had acted in bad faith by deciding to accept Microsoft's offer before even considering Corel's offer. The testimony of Messrs. Hugler and Eanet was explicative of DOL's decision-making process, filling in gaps in the administrative record, and is therefore admissible. I will also deny the government's motion to strike various statements made by Mr. Hugler at the June 13, 2000 status hearing before this Court because all of the statements attributed to Mr. Hugler (Pl.'s Mem. Supp. Prelim. Inj. at 13) were also explicative of DOL's decision-making process.

did. As this Court has noted in the past, "consideration of outside evidence 'to determine the correctness or wisdom of the agency's decision is not permitted.'" *National Treasury Employees Union*, 840 F.Supp. at 169. (quoting *Asarco, Inc. v. U.S. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980)); *see also Doraiswamy v. Secretary of Labor*, 555 F.2d 832, 842 (D.C.Cir.1976) (affirming exclusion of extrinsic evidence offered to challenge the correctness of the agency's decision as opposed to the "fullness" of the reasons given). Because Dr. DeRamus's declarations are offered primarily to attack the propriety of the challenged agency action, they will be stricken.

■■■ The record that is properly before me demonstrates that DOL's decision to standardize to Microsoft was not arbitrary and capricious. In its final justification for standardizing to Microsoft, DOL cited four major reasons supporting its decision. First, DOL claimed that "Microsoft Office maximizes utilization of the Department's desktop *operating system*, which today is Microsoft for all DOL agencies [except for three]." (AR Tab 12 at 385) (emphasis in original). Second, DOL asserted that "Microsoft Office is the *top rated* office automation suite for the value it provides to its users." (*Id.*) (emphasis in original). Third, DOL maintained that "Microsoft Office is the *most widely used* office automation suite installed on more than 80 percent of all personal computers." (*Id.*) (emphasis in original). Finally, DOL noted that "the majority of the Department is *already using or planning* to move to Microsoft Office." (*Id.*) (emphasis in original).

DOL's final justification itself is not a model of analytical clarity. It does not cite to the record, tends toward the conclu-

sory at points, and is altogether a less than comprehensive document. However, although not every statement in the justification is adequately supported by the record, enough of them are and they establish that DOL's decision satisfies "baseline substantive rationality." *Elcon Enters.*, 977 F.2d at 1479.

As an initial matter, Corel contends that DOL's claim that Microsoft Office "maximizes utilization" of the operating system is simply a conclusory assertion unsupported by any tangible evidence that Corel applications do not run as well as Microsoft applications do on Microsoft's operating system. However, the record does reflect that DOL had experienced problems with Corel software applications operating on Microsoft's operating systems. For example, the record contains an extensive log of computer problems WordPerfect users had reported to DOL's computer help desk. (AR Tab 12a at 392a-q.) Although Corel has posited that many of these problems can be traced to Microsoft's operating system as opposed to Corel's software (Decl. of Robert Berndt Ex. 1, Attach to Pl.'s Opp'n to Def.'s Mot. to Dismiss or, in the Alternative, Summ. J.),[14] the fact remains that interoperability between the operating system and software applications was an issue that DOL reasonably sought to address. It would be inappropriate to second guess DOL's judgment about its minimum computer needs. *See Building and Constr. Trades Dept., AFL–CIO v. Brock*, 838 F.2d 1258, 1266 (D.C.Cir.1988) ("When called upon to review technical determinations on matters to which the agency lays claim to special expertise, the courts are at their most deferential.") (citation omitted).

It is also important to note that the final justification did not simply rely on DOL's

14. I will not strike the Berndt declaration as the government has requested because I find that it elucidates a complicated area of the record by indicating the potential source of the computer problems that had been reported.

own experience as reason enough to standardize. It also cited the example of Hewlett Packard which had reportedly converted to a single office suite and confirmed that it subsequently achieved increased efficiency in information dissemination and corresponding decreases in the costs, related to computer ownership, software installation and support, technical support, and software licensing. (AR Tab 12 at 384.) In view of the foregoing, I find that DOL's decision to standardize to a single office suite was rational and supported by the record.

The remainder of Corel's argument focuses on DOL's decision to choose Microsoft Office over Corel Office Suite. Corel first argues that DOL's characterization of Microsoft Office as the "top-rated" office suite is based on DOL's selective choice of product reviews, some of which are outdated, and all of which were published by the same company. However, the product reviews cited in DOL's justification (AR Tab 12 at 392) do not constitute an exhaustive list of the product literature reviewed by DOL. The administrative record contains more recent product reviews lauding Corel Office Suite which DOL officials presumably consulted. (AR Tab 54 at 1724–34.) Moreover, even if Microsoft Office is not uniformly regarded as the "top rated" office suite, DOL's decision to choose Microsoft over Corel was not irrational simply because various product reviews, whether in the administrative record or elsewhere, differ in their assessments of which product is superior.

Next, Corel claims that DOL's contention that Microsoft Office is the "most widely used office suite" is irrelevant because DOL purported to be focusing primarily on intra-agency communications. However, it was perfectly rationale for DOL to consider Microsoft's overall market share because, as the final justification

noted, "[c]ompany viability and market share, as well as the use/installation of these products for home and commercial use, indicate continued viability of the product." (AR 12 at 386.) DOL thus quite logically sought to assure itself in the face of the significant investment it was making that the office suite it ultimately chose would remain on the market for the indefinite future. Overall market share is directly relevant to that concern.

Corel's next and most effective salvo is a multi-front attack on DOL's contention that it would be more efficient to standardize to Microsoft. According to Corel, the justification's statement that the majority of DOL's contingent agencies were "already using or planning to move to Microsoft Office" is misleading and factually incorrect. Corel maintains that: (1) the vast majority of DOL users (at least 64% by DOL's own count) currently use Corel's WordPerfect as their word processing program, which is by far the most used component of any office suite; (2) DOL improperly inflated the "installed base" of Microsoft Office (i.e. the number of computers on which Microsoft Office was already installed); and (3) DOL's cost-benefit analysis is wholly insufficient.

With respect to Corel's initial contention, it was not irrational for DOL to use as its unit of analysis the installed base of office suites as opposed to individual applications. As discussed above, DOL rationally determined that standardization would best solve the interoperability problems it had experienced. Thus, although Corel WordPerfect was DOL's predominant word processing program, once the decision to standardize to an office suite was made, it was sensible for DOL to determine which office suite was most compatible with DOL's existing computer architecture.

Corel's claim that DOL improperly inflated its installed base of Microsoft Office deserves more serious attention. At oral argument, plaintiff's counsel pointed out some troubling inconsistencies in the figures DOL used to determine its respective installed bases. DOL's final justification indicates that 43% of DOL users were using Microsoft Office, 24% were planning to convert to Microsoft Office, 18% were using Corel Office Suite, and no suite was planned for 15%. (AR Tab 12 at 387.) However, Corel noted that the raw numbers on which DOL relied to make these calculations (AR Tab 12 at 390–91) are very different from the raw numbers Abacus had compiled less than a year earlier in its August 14, 1998 report. (AR Tab 64 at 2320.) Corel was able to demonstrate by comparing these two sets of data that the final justification increased Microsoft Office's installed base by approximately 500 users and then decreased Corel's installed base by 3,320 users. If the figures in the Abacus report had been used, Corel actually would have had a slightly larger installed base than Microsoft. The government could not explain this discrepancy between the final justification and the Abacus report other than to say that the final justification was issued nearly a year after Abacus report was, thus suggesting the possibility that the relative installed bases changed during the interim period.

The difference in installed bases translates directly into Corel's next argument—that the DOL's purported cost justification for choosing Microsoft over Corel is either fabricated or just plain wrong. A footnote in the final justification indicates that it would cost DOL approximately 44% more to convert its office suites from Microsoft to Corel than vice versa. (AR Tab 12 at 387 n. 5.) This 44% cost-differential was apparently derived from cost estimates based on Microsoft and Corel's offers. (AR Tab 23 at 632.) DOL officials esti- mated that it would cost $7.6 million to convert to Corel, but only $5.3 million to convert to Microsoft. (*Id.*) However, if the installed bases for Microsoft Office and Corel Office Suite were miscalculated, DOL's cost estimates for converting to a particular office suite would presumably be inaccurate as well.

Notwithstanding the discrepancies in the record that Corel has highlighted, I cannot conclude in the context of the totality of the record that they render DOL's decision to select Microsoft irrational. As this Court has noted in the past, "[g]iven the deference to be afforded an agency's procurement decision, the fact that the contract did not go to another private contractor which could provide comparable services at a lower price does not demonstrate that the decision is irrational or lacks any rational basis." *Varicon Int'l,* 934 F.Supp. at 445 (citing *Delta Data,* 744 F.2d at 204); *see also Iceland Steamship,* 201 F.3d at 462 (noting that "judges are not financial advisors to the United States government"); *Elcon Enters.,* 977 F.2d at 1482 (holding that the decision to award a contract to a "higher-cost but more experienced contractor is not irrational"). While Corel may have been able to provide to DOL a comparable product at a cheaper price, DOL determined that Microsoft Office would best solve its computer problems. Accordingly, it would not have been irrational for DOL to pay more for Microsoft to assure that its minimum needs were met.

■ It is also important to note that, although some of DOL's constituent departments leveled harsh criticism at the justification's cost-benefit analysis or perceived lack of one (AR Tab 8 at 337–344; Tab 20 at 476–80), dissension in the ranks does not render an agency decision irrational. Criticism is the natural result of a

deliberative process. An agency need not address or resolve every complaint and criticism that is raised for the reviewing court to conclude that the ultimate decision was rational. *See BMY, Division of Harsco Corp. v. United States,* 693 F.Supp. 1232, 1247–48 (D.D.C.1988) (finding that disagreements among evaluation teams within agency did not imply that final decision was irrational).

Corel's final assault on the rationality of DOL's decision consists of an argument that DOL's decision to buy only Microsoft products was tainted by bad faith conduct. Corel contends that DOL pre-determined to buy Microsoft, refused to provide Corel with information about DOL's specifications and decision-making, and then conducted a sham competition to make it appear as though DOL actually considered Corel's offer. Although it is understandable why Corel would feel slighted by DOL, particularly in light of Corel's belief that DOL deliberately inflated its installed base of Microsoft Office to Corel's detriment, the record does not adequately support Corel's claim that DOL acted in bad faith.

▪▪▪ To justify departing from the presumption that government officials act in good faith in the discharge of their duties, the plaintiff "must allege and prove, by clear and strong evidence, specific acts of bad faith on the part of the government." *Libertatia Assocs., Inc. v. United States,* 46 Fed. Cl. 702, 706 (2000). Indeed, in the context of government contracting cases, courts have generally required "well nigh irrefragable proof" of bad faith, which "has been equated with evidence of some specif-

ic intent to injure the plaintiff." *Kalvar Corp. v. United States,* 211 Ct.Cl. 192, 543 F.2d 1298, 1302 (1976).

In view of the administrative record and the supplemental materials I have admitted, Corel has not met this high standard. The record does reveal that a recommendation to select Microsoft was being formulated and circulated throughout DOL for comment at least as early as March of 1999. (AR Tab 41 at 1349.) Based on this evidence, I permitted Corel to engage in limited discovery on the issue of whether DOL had pre-selected Microsoft in bad faith. Having reviewed the deposition transcripts that have been submitted, I am now satisfied that Corel cannot make the requisite showing of bad faith.[15]

That a recommendation to standardize to Microsoft was being formulated before Corel was given an opportunity to make its presentation does not imply that DOL did anything improper. As is discussed at length above, DOL was not required to comply with CICA's full and open competition requirements. The fact that DOL invited Microsoft and Corel to submit pricing data and to make presentations does not alter this result. *See Health Sys. Architects, Inc.,* 992 F.Supp. at 809 (finding that agency's decision compare competing software systems did not mean that the agency "voluntarily conducted a 'competition,' thereby making it voluntarily subject to CICA for its choice of software systems"). Moreover, the internal DOL communications on which Corel has focused were apparently intended to encourage

---

**15.** Corel has argued in its supplemental brief that I should not consider the portions of the deposition transcripts submitted by the government on the eve of the consolidated hearing. I reject this argument because I gave Corel a full and fair opportunity to respond to the government's filing after the hearing. Corel chose not to address the excerpts of the transcripts submitted by the government nor did Corel submit its own excerpts. In moving for expedited discovery, Corel took the position that such discovery was absolutely necessary to fill in gaps in the administrative record. I will not allow Corel to have it both ways by ignoring the information that was provided.

DOL's constituent agencies to provide the evaluation team with technical and cost information so that the evaluation team could more accurately assess what a conversion to Microsoft would entail. (Eanet Dep. Tr. at 190–95.) Although DOL was plainly exploring the possibility of standardizing to Microsoft early on, and some agency officials were certainly leaning strongly in that direction before Corel made its presentation, the record as a whole simply does not support Corel's conclusion that a firm decision to convert to Microsoft had already been made before Corel made its final presentation in April.

Moreover, despite the fact that DOL was under no statutory obligation to do so, it did give Corel an opportunity to meet with DOL officials and to submit pricing and technical information. The record also indicates that DOL officials considered the information provided by Corel in formulating their ultimate recommendation. (AR Tab 23 at 632; Tab 25 at 662; Tab 26 at 663; Tab 27 at 666–67.) DOL decided to choose Microsoft anyway. In view of the applicable statutory and regulatory framework and the record as a whole, that choice was not illegal or irrational.

## CONCLUSION

This Court has subject matter jurisdiction over Corel's claims, but those claims fail on the merits because the DOL made its procurement in accordance with FASA instead of CICA. Moreover, even if DOL's standardization decision is reviewable under the APA, Corel has not established that DOL took a procurement action that was either procedurally infirm or substantively irrational. Accordingly, Corel's motion for a preliminary injunction will be denied and summary judgment will be entered in favor of the government and GTSI. An order consistent with this Opinion will be issued.

## ORDER

For the reasons set forth in the accompanying Memorandum Opinion, it is hereby

ORDERED that plaintiff's Motion for Leave to File Surreply [32] be, and hereby is, DENIED. It is further

ORDERED that the defendant's Motions to Strike [31], [48] be, and hereby are, GRANTED IN PART AND DENIED IN PART. It is further

ORDERED that the first and second declarations of Dr. David DeRamus be, and hereby are, stricken from the record. It is further

ORDERED that the plaintiff's Motion for a Preliminary Injunction [40] be, and hereby is, DENIED. It is further

ORDERED that the defendant's Motion to Dismiss [18–1] be, and hereby is, DENIED. It is further

ORDERED that the defendant's Motion for Summary Judgment [18–2] be, and hereby is, GRANTED. It is further

ORDERED that judgment be, and hereby is, entered in favor of the defendant and defendant-intervenor. All other pending motions are denied as moot. This is a final appealable Order.